# IN THE COURT OF APPEALS OF IOWA

No. 14-1517
Filed February 25, 2015

**IN THE INTEREST OF T.S. and K.G.,**
        **Minor Children,**

**L.G., Mother,**
        Appellant.

**K.G., Father of K.G.,**
        Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Rachel E. Seymour,

District Associate Judge.


        A mother and father separately appeal from an order terminating their

parental rights.  **AFFIRMED ON BOTH APPEALS.**

        Jessica Maffitt of Benzoni Law Office, P.L.C., Des Moines, for appellant-

mother.

        Kevin Hobbs, West Des Moines, for appellant-father.

        Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant

Attorney General, John P. Sarcone, County Attorney, and Christina Gonzalez,

Assistant County Attorney, for appellee.

        John Heinke of Kragnes & Associates, P.C., Des Moines, for father of T.S.

        Brent Michael Pattison of Drake Legal Clinic, attorney and guardian ad

litem for T.S.

        Marshall Orsini, Des Moines, attorney and guardian ad litem for K.G.

        Considered by Mullins, P.J., and Bower and McDonald, JJ.

**MULLINS, J.**

The mother appeals the termination of her parental rights to two children, K.G. and T.S. The father of K.G. appeals the termination of his parental rights to K.G. The father of T.S. does not appeal termination of his parental rights to T.S.

The mother contends her attorneys for the child-in-need-of-assistance and termination-of-parental-rights proceedings were ineffective. She further contends the expedited termination appeals process creates a per se violation of terminated parents' rights to due process. She also challenges the sufficiency of the evidence to support termination of her parental rights to T.S. under Iowa Code section 232.116(1)(h) (2013) and to K.G. under section 232.116(1)(d) and (e). The father contends there was insufficient evidence to support termination of his parental rights to K.G. under sections 232.116(1)(b) and (e).

With respect to the mother, we find her trial and appellate attorneys were not ineffective. We further find the expedited termination appeal process does not create a per se violation of terminated parents' due process rights. With respect to the statutory grounds, we affirm termination of her parental rights to T.S. under Iowa Code section 232.116(1) (h), and to K.G. under 232.116(1)(e). With respect to the father of K.G., we find the evidence supported termination of his parental rights under section 232.116(1)(e).

## I. BACKGROUND FACTS & PROCEEDINGS.

K.G. was born in 2000 to her mother, Leanne, and father, Kirk, in the state of Colorado. Leanne and Kirk divorced when Leanne became pregnant with a child by John. Leanne and John's child, T.S., was born 2012. For several years

while all the parents lived in Colorado, Kirk paid Leanne child support and had visitation with K.G. In November 2012, Leanne and John moved to Iowa where John's family resides, bringing K.G. and T.S. with them.

The Department of Human Services (DHS) became involved with the family in October 2013 when John was charged with domestic abuse assault against Leanne. At that time, DHS discovered both Leanne and John used methamphetamine; that Leanne frequently left the children alone with John; and that John used drugs to the point of passing out while he was caring for the children, and Leanne was aware of this. Leanne and John have a long history of domestic violence and of drug use, primarily methamphetamine. They had been together approximately seven years. K.G. had been acting as another parent to T.S., caring for him while the parents used drugs, and K.G. tried to protect T.S. from observing the domestic violence in the home. By temporary emergency order, the juvenile court removed the children from Leanne and John's home and placed them with T.S.'s paternal grandparents.

On November 8, 2013, the juvenile court adjudicated the two children in need of assistance (CINA) under Iowa Code section 232.2(6)(b) (parent has physically abused or neglected the child, or is imminently likely to abuse or neglect the child), (c)(2) (failure of parent to exercise a reasonable degree of care in supervising the child), and (n) (parent's drug or alcohol abuse results in the child not receiving adequate care). Leanne stipulated to the adjudication. The juvenile court ordered Leanne to participate in substance abuse treatment and drug testing.

In late November 2013, DHS reported that Leanne obtained substance abuse and mental health evaluations, was attending therapy with a mental health counselor to address her substance abuse and domestic violence issues, and was attending parenting classes. Leanne was diagnosed with adjustment disorder. She had visitation three times per week, and DHS offered to make the visits semi-supervised instead of fully-supervised. DHS also reported that K.G. was diagnosed with moderate depression and that she had made some suicidal statements. K.G. was attending weekly therapy. T.S. had no major health concerns but had some speech delays and would be evaluated. DHS recommended that in order for reunification to occur, Leanne would need to show commitment to her sobriety, address her mental health in individual therapy, continue parenting classes, attend domestic violence awareness classes, and demonstrate she is able to be a safe and protective parent.

The court entered a dispositional order December 9, 2013, wherein it stated:

> The Court finds Mother has made progress but the length of time Mother placed these children at risk justified Mother demonstrating safe choices for a longer period of time before the children are returned . . . . Placement outside the parental home is necessary because continued placement in or a return to the home would be contrary to the children's welfare due to parent's unresolved domestic violence, substance abuse issues and mental health and lack of supervision issues.

The court ordered Leanne to continue participating in individual therapy and follow recommendations of the therapist regarding substance abuse, mental health, and domestic violence.

In February 2014, Leanne tested positive for methamphetamine. In April, she tested positive again. Following the April 2014 permanency hearing, the court changed the permanency goal to termination. DHS resumed fully-supervised visitations. At the time of the positive tests, Leanne continued to deny using, stating the drug screens were inaccurate. Throughout the case, Leanne changed her story about her past drug use. At the adjudication hearing, she stated she had last used drugs four to six months prior. In a substance abuse evaluation in March 2014, she reported she had not used in two years. In another evaluation done at the beginning of May 2014, she reported she had not used in three years. At yet another evaluation at the end of May, she admitted to a recent relapse and to smoking methamphetamine four times per week. The counselor recommended she receive residential treatment. Leanne reported to the counselor she did not believe she needed residential treatment and would look for outpatient services.

On May 9, 2014, the State filed a petition to terminate the parental rights of Leanne to K.G. and T.S.; Kirk to K.G.; and John to T.S. DHS, the Court-Appointed Special Advocate (CASA), and the guardian ad litem all recommended termination of the three parents' rights. Prior to the termination hearing, DHS reported Leanne sent texts to K.G. asking K.G. to lie to the grandparents and to contact Leanne without DHS authorization. Leanne also asked K.G. to delete the texts after reading them. Leanne reported to DHS that she was taking online domestic violence classes, but also stated she wishes she had not called police the night the children were removed. DHS averred this was a safety concern if

the children were returned to Leanne because if another domestic violence incident were to occur, Leanne might not be willing to protect her children by calling police.

In April, John was arrested for a violation of his probation. Although there was a no-contact order in place between John and Leanne stemming from the October 2013 domestic abuse assault charges, Leanne called John in jail and visited him there. John stated that prior to his arrest he had been seeing Leanne regularly and staying at her home in violation of the no-contact order. He also stated they had been using methamphetamine together regularly. During one visitation in Leanne's home, John unexpectedly walked into the apartment while a DHS worker was supervising. At Leanne's request the district court later vacated the no-contact order.

Prior to Leanne and John moving to Iowa in November 2012, Kirk had been paying child support to Leanne for K.G. and exercising visitation each weekend. After moving to Iowa, Kirk continued paying child support but did not see K.G. regularly. He was in contact with her over the phone or by text. He did not inquire into K.G.'s new living environment. She did, however, spend three months in the summer of 2013 with Kirk in Colorado. Although notified of all the CINA and termination proceedings, Kirk has had minimal participation in this case on behalf of K.G. He stated he could not afford to travel to Iowa to do so, could not take time off work, and was caring for his elderly father. He attended the adjudication hearing in November 2013, but did not request appointment of counsel. He attended only one of the two days of the termination hearing, but did

not attend any other court proceedings or meetings with service providers. Prior to the termination hearing he requested and obtained appointment of counsel. At no time did he request custody of K.G., participate in any services, inquire into any of the services K.G. was receiving, or ask for a home study for placement of K.G. with him.

The court held the termination hearing on June 6 and 9, 2014. At that time, Leanne had started but had not completed outpatient substance abuse treatment. She admitted to lying about being pregnant in an attempt to get into a residential treatment facility. She continued to see a therapist, but the therapist did not provide substance abuse counseling, only mental health counseling. She had attended some domestic violence classes. She admitted she told John she would marry him when he is released from jail. She later said she was just trying to manipulate him. John was still in jail on drug-related charges and continued to use drugs. The juvenile court terminated Leanne's parental rights to T.S. under Iowa Code section 232.116(1)(d), (e), and (h). It terminated Leanne's parental rights to K.G. under paragraphs (d) and (e). It terminated Kirk's parental rights to K.G. under paragraphs (b) and (e). Finally, it terminated John's parental rights to T.S. under paragraphs (b), (d), (e), and (h). Leanne and Kirk appeal.

## II. STANDARD OF REVIEW.

We review termination of parental rights de novo. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). We will uphold an order terminating parental rights where there is clear and convincing evidence of the statutory grounds for termination. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Evidence is clear and convincing

when there is no serious or substantial doubt as to the correctness of the conclusions of law drawn from the evidence. *Id.*

## III. ANALYSIS.

### A.    Constitutional Claims.

#### 1.    Ineffective assistance of CINA counsel.

We review constitutional claims de novo. *In re C.M.*, 652 N.W.2d 204, 209 (Iowa 2002). The test for ineffective assistance of counsel in termination proceedings is the same as that used in criminal proceedings. *In re A.R.S.*, 480 N.W.2d 888, 891 (Iowa 1992). The parent must show (1) counsel's performance was deficient, and (2) actual prejudice resulted. *C.M.*, 652 N.W.2d at 207. Counsel has no obligation to raise a meritless issue. *Id.*

Leanne contends she was denied effective assistance of counsel in the CINA case because counsel failed to appeal the court's adjudication of the children under Iowa Code section 232.2(6)(b). She argues she was prejudiced because a CINA determination under subsection (6)(b) can lead to a termination of parental rights under Iowa Code section 232.116(1)(d). Subsection (6)(b) provides a child in need of assistance is one "[w]hose parent, guardian, other custodian, or other member of the household in which the child resides has physically abused or neglected the child, or is imminently likely to abuse or neglect the child."

We note first that Leanne stipulated to adjudication of the two children under Iowa Code sections 232.2(6)(b), (c)(2), and (n). Second, we find adjudication of the children under subsection (6)(b) was appropriate. The

juvenile court found the children were in the home during a domestic abuse assault on October 3; that John passed out from drug use while alone with the children in the home; and that Leanne was aware his drug and alcohol use but left the children with him anyway. The court concluded there was clear and convincing evidence to support adjudication of the children on the alleged grounds. On our review of the record, we agree that the evidence supports a finding that John and Leanne were imminently likely to abuse or neglect the children, and adjudication was proper under subsection (6)(b). Because it would have been a meritless appeal, trial counsel had no duty to raise it and, thus, was not ineffective.

Leanne also contends trial counsel was ineffective for failing to appeal the court's rulings following the adjudication and disposition hearings not to return the children to her care. She asserts she was prejudiced because, had the children been returned to her earlier, her rights would not have been terminated under termination sections 232.116(1)(e) or (h). At the adjudication, the court found it would be contrary to the children's welfare to return them to Leanne's home because of "unresolved domestic violence issues and substance abuse issues."[1] The court also found the State had made reasonable efforts to prevent

---

[1] Iowa Code section 232.96(10)(a) provides:

> If the court enters an order adjudicating the child to be a child in need of assistance, the court . . . may issue an order authorizing temporary removal of the child . . . . The order shall include . . . :
>
> a. A determination that continuation of the child in the child's home would be contrary to the welfare of the child, and that reasonable efforts, as defined in section 232.102, have been made to prevent or eliminate the need for removal of the child from the child's home . . . . [P]reserving the safety of the child is the paramount consideration.

the need for removal. At that time, Leanne had received little substance abuse treatment and had not engaged in any domestic violence classes or therapy. The juvenile court correctly determined returning the children to the home would have been contrary to their welfare. As it would have been a meritless claim, CINA counsel had no duty to raise it and, therefore, was not ineffective.

> **2.** **Violation of due process rights and ineffective assistance of termination-appeal counsel.**

Leanne contends that the termination appeals process creates a per se violation of the terminated parent's due process rights[2] by making it impossible for appellate counsel to provide effective assistance. She asserts, because the transcript of the termination hearings was not prepared prior to the filing deadline for her petition on appeal, counsel was not capable of reviewing the record and adequately presenting her arguments. Arguments generally must be raised on appeal or they are deemed waived. Furthermore, Leanne's trial counsel withdrew after the termination hearing, and the court appointed new counsel to represent her in the appeal. She asserts, without the transcript, appellate counsel could not effectively represent her.

When assessing a procedural due process claim, we must first determine if there is a protected liberty or property interest at stake. *C.M.*, 652 N.W.2d at 211. Our supreme court has determined that a termination-of-parental-rights

---

[2] The Fourteenth Amendment to the federal constitution provides no state shall "deprive any person of life, liberty, or property, without due process of law." The due process clause of the Iowa Constitution generally has been interpreted as identical in "scope, import, and purpose to the federal clause." *Exira Cmty. Sch. Dist. v. State*, 512 N.W.2d 787, 792 (Iowa 1994).

proceeding clearly involves a parent's fundamental interest in the care, custody, and control of his or her child. *Id.*

Because a protected interest is involved, we must determine what procedure is constitutionally required. *Id.* at 212. We do that by balancing three competing interests: (1) the private interest affected by the proceeding; (2) the risk of error created by the procedures used, and the ability to avoid such error through additional or different procedural safeguards; and (3) the countervailing governmental interests supporting use of the challenged procedures. *Id.*

We have already identified the protected interest—"[a] parent has an interest in the custody of his or her child." *Id.* With regard to the third factor, our supreme court has explained:

> The State has an interest in finalizing the termination procedure in an expedient manner so as to meet the child's emotional and psychological need for a permanent home, as well as to control the financial drain on the State caused by needlessly protracted proceedings. Interestingly, the parent in a termination case also has an interest in a speedy conclusion because of the potential of regaining custody.

*Id.* The remaining factor is the risk of error created by the existing procedures.

Iowa has an expedited appeals process for termination-of-parental-rights cases. Iowa Rule of Juvenile Procedure 8.21 provides the terminated parent must file a notice of appeal within fifteen days of the entry of the order and a petition on appeal within fifteen days thereafter. Further procedures in CINA and termination appeals are set out in the Iowa Rules of Appellate Procedure 6.201-.205. The opposing party, usually the State, has fifteen days to file a response to the petition on appeal. Iowa R. App. P. 6.202(2). Rule 6.201(2) provides the

appellant-parent shall request the clerk of court to transmit the record of the termination proceeding, including the transcript, within thirty days after the filing of the notice of appeal. The appellate court reviews the petitions and the record de novo and may affirm or reverse the juvenile court's order, remand the case, or set the case for full briefing. Iowa R. App. P. 6.205. In practice, cases rarely are set for full briefing in the court of appeals. We also recognize the petitioner-appellant usually does not receive the transcript prior to preparing the petition on appeal—the length of the proceedings and the manner of transcript preparation in Iowa are impediments to having transcripts prepared that quickly.

The Iowa appellate courts previously have addressed the issue of the expedited deadlines in termination appeals and the unavailability of the transcript in the preparation of the petition. In *In re R.K.*, 649 N.W.2d 18, 20 (Iowa Ct. App. 2002), the terminated parent argued the expedited appellate procedure violated her procedural due process rights in depriving her of the opportunity to review the transcript thoroughly, research the issues, and draft the petition. This court noted that termination counsel also handled the appeal, and the appellate court had the ability to review the full record and transcript. *R.K.*, 649 N.W.2d at 21. Thus, we concluded the expedited procedure, wherein the parent does not have access to a transcript in preparing the petition, contained sufficient safeguards for the parent's due process rights. *Id.* at 22. The supreme court reached substantially the same conclusion in *C.M.*, 652 N.W.2d at 212-13, wherein a terminated parent complained about the lack of full briefing in her appeal. Again, the court noted termination counsel handled the appeal, and the appellate court had access to

the entire record and the trial transcript when conducting de novo review. *C.M.*, 652 N.W.2d at 212; *see also In re J.A.D.-F.*, 776 N.W.2d 879, 884 (Iowa Ct. App. 2009) (noting "[p]ractitioners routinely make closing arguments and post-trial motions without the benefit of a transcript").

In the above-cited cases, which speak approvingly of the expedited procedure's preservation of the terminated parent's due process rights, the attorney who represented the parent in the termination hearing handled the appeal as well. Iowa Rule of Appellate Procedure 6.201(1)(a) specifically provides, "The appellant's trial counsel shall prepare the petition on appeal. Trial counsel may be relieved of this obligation by the district court only upon a showing of extraordinary circumstances."

In the case before us, the court filed its termination order on August 31, 2014. Leanne's CINA and termination attorney filed a notice of appeal on September 15. On September 16, he filed an application to withdraw. The court, finding insufficient reason to justify withdrawal, denied the motion on September 18. Also on September 18, the parties filed the combined certificate and ordered transcripts of the termination proceeding. On September 22, Leanne's attorney filed a new application to withdraw, citing the following reasons:

> This attorney has not done an appeal for over 30 years, does not know how to properly format an appeal, does not have a secretary to type the appeal brief, does not have adequate typing skills, needs to type with two fingers to type the appeal brief himself and this attorney would have to hire another attorney to perfect his client[']s appeal.

The court granted this application, finding the attorney showed the requisite extraordinary circumstances. It appointed Leanne appellate counsel. This

occurred on September 24, six days before the filing deadline on the petition on appeal. Appellate counsel timely filed the petition on September 30.

Thus, in Leanne's case, trial counsel withdrew prior to filing the petition on appeal. Leanne argues appellate counsel cannot rely on her own recollections of the termination hearings to address all the potential appealable issues, thus, she was deprived of the procedural safeguard present in the above-cited cases. In a similar case, *In re L.M.*, 654 N.W.2d 502, 506 (Iowa 2002), the terminated mother argued that *any* attorney representing a parent in an expedited termination appeal is ineffective because the transcript cannot be prepared within the procedural timeframes. Leanne's argument, framed as a due-process violation, is substantially the same. The supreme court disagreed with the mother in *L.M.*, finding the following:

> The rules contemplate that the petition will be prepared by trial counsel. *See* [now Iowa R. App. P. 6.201(1)(a)] . . . . The petition itself is a streamlined, fill-in-the-blanks form, designed to be completed in an expeditious manner. With respect to factual matters, the appellant is merely asked to state the material facts as they relate to the issues presented for appeal. As for the legal aspects of the appeal, counsel is simply required to state the legal issues presented for appeal, including a statement of how the issues arose and how they were preserved for appeal with a citation to legal authority. Counsel is not expected to exhaustively review the evidence at trial, nor must counsel cite to the record to demonstrate error. Verification of counsel's statements of the facts and issues preserved will be undertaken by the reviewing court, which will have the trial transcript available for reference. *Even in the extraordinary situation where trial counsel does not prepare the petition on appeal, the new attorney would most likely be able to consult with trial counsel and the client, as well as be able to review the court file.*

654 N.W.2d at 506 (emphasis added; internal quotation marks and citations omitted). It appears from the record before us that Leanne's termination counsel

withdrew because he did not feel competent to handle an appeal and did not have the resources of time and skill to do so. As there is no claim of deficiency in his memory or understanding of the CINA and termination proceedings or his availability, Leanne's appellate counsel could have consulted with him. The submitted petition does not indicate whether counsel did that. However, with respect to Leanne's contention, the foregoing authorities show that there is no per se due process violation inherent in the unavailability of the hearing transcript for termination appeals. Therefore, we reject Leanne's due process and ineffective-assistance-of-appellate-counsel claims.

### B. Statutory Grounds for Termination.

We will uphold an order terminating parental rights where there is clear and convincing evidence of the statutory grounds for termination. *D.W.*, 791 N.W.2d at 706. Evidence is clear and convincing when there is no serious or substantial doubt as to the correctness of the conclusions of law drawn from the evidence. *Id.* When the juvenile court orders termination of parental rights on more than one statutory ground, we need only find grounds to terminate on one of the sections to affirm. *In re J.B.L.*, 844 N.W.2d 703, 704 (Iowa Ct. App. 2014).

#### 1. T.S.

The juvenile court terminated Leanne's parental rights with respect to T.S. under Iowa Code section 232.116(1)(d), (e), and (h). To terminate under paragraph (h), the State must show by clear and convincing evidence the child is three years old or younger, has been adjudicated a child in need of assistance, has been removed from the parent's care for at least six of the last twelve

months, or the last six consecutive months and any trial period at home has been less than thirty days, and the child cannot be returned to the parent's custody at the time of the termination hearing.

At the time of the termination hearing, T.S. was just over two years old. He was adjudicated a child in need of assistance in the November adjudication order. He had been removed from Leanne's home for eight months with no trial periods at home. The children were removed from the home originally due to domestic violence and the parents use of drugs while supervising the children. At the time of the termination hearing, Leanne had been recommended for residential substance abuse treatment and had not started it. She told the substance abuse counselor she did not believe she needed residential treatment. She had begun—but not completed—outpatient substance abuse treatment. Until the termination petition was filed, she had given differing accounts of her past drug use, resulting in her not getting accurate treatment recommendations. She had relapsed and used methamphetamine as recently as April. She had attended domestic violence classes; however, she continued to see her abuser, John, on multiple occasions and in violation of the no-contact order, which stemmed from the incident for which her children were removed. The record discloses that Leanne has gained very little insight over the course of these proceedings about her domestic violence issues and the dangers they pose to the children. Returning T.S. to her would be contrary to his welfare.

Leanne complains the district court referred to and relied on her "mental health issues" in its termination order. She asserts there is no evidence in the

record that she has a mental health disorder or personality disorder. However, Leanne herself testified she was diagnosed with adjustment disorder and she sees a therapist who treats mental health issues. Nonetheless, the children were removed due to the domestic violence and substance abuse issues in the home, and those concerns alone are sufficient to support termination under paragraph (h). We find the State has shown sufficient evidence to support termination of Leanne's parental rights to T.S. under paragraph (h). We affirm the juvenile court's order in that respect.

### 2. K.G.

#### a. *Leanne's Parental Rights to K.G.*

##### i. Paragraph (d).

The juvenile court terminated Leanne's parental rights with respect to K.G. under Iowa Code section 232.116(1)(d) and (e). To terminate parental rights under paragraph (d), the State must show:

1. The court has previously adjudicated the child to be in need of assistance [(CINA)] after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding [;and]
2. Subsequent to the child in need of assistance adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

In the termination ruling, the juvenile court noted that K.G. was adjudicated pursuant to Iowa Code section 232.2(6)(b), (c)(2), and (n). It made no further finding as to existence in the record of evidence of physical or sexual abuse or

neglect. Leanne contends the district court erred in adjudicating K.G. under 232.2(6)(b) because there was no allegation of physical injury.

We have already found adjudication under subsection (6)(b) was proper under the "imminently likely" clause. However, for the purposes of termination and to satisfy subparagraph (d)(1), a showing that physical injury is "imminently likely" is not sufficient. *See In re J.S.*, 846 N.W.2d 36, 41 (Iowa 2014). In *J.S.*, the parent appealed from the juvenile court order adjudicating the child under section 232.2(6)(b). *Id.* As stated, adjudication under section 232.2(6)(b) requires a showing that the parent "physically abused or neglected the child, or is imminently likely to abuse or neglect the child." But, termination under section 232.116(1)(d)(1) requires a finding that the child "[has] been physically or sexually abuse or neglected." Thus, we must look for evidence of a physical injury, rather than the mere imminent likelihood of a physical injury that is sufficient under 232.2(6)(b). With regard to the existence of a prior injury, our supreme court explained that:

> Within chapter 232, "physical abuse or neglect" and "abuse or neglect" mean "any nonaccidental physical injury suffered by the child as the result of the acts or omissions of the child's parent, guardian, or custodian or other person legally responsible for the child" . . . .
> [P]hysical injury to the child is a prerequisite to finding *past* physical abuse or neglect.

*Id.* (internal citations and quotation marks omitted). The juvenile court made no finding that there was a physical injury to K.G., nor is there any evidence in the record of a physical injury. As such, although the CINA adjudication was appropriate under the "imminently likely" clause of 232.2(6)(b), the facts do not

support the juvenile court's termination of Leanne's parental rights to K.G. under paragraph (d), and we reverse the order to that extent.

### ii. Paragraph (e).

To terminate parental rights under section 232.116(1)(e), the State must show:

1. The child has been adjudicated a child in need of assistance pursuant to section 232.96.
2. The child has been removed from the physical custody of the child's parents for a period of at least six consecutive months.
3. There is clear and convincing evidence that the parents have not maintained *significant and meaningful contact* with the child during the previous six consecutive months and have made *no reasonable efforts* to resume care of the child despite being given the opportunity to do so. For the purposes of this subparagraph, "significant and meaningful contact" includes but is not limited to the affirmative assumption by the parents of the duties encompassed by the role of being a parent. This affirmative duty, in addition to financial obligations, requires continued interest in the child, a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with the child, and requires that the parents establish and maintain a place of importance in the child's life.

(Emphasis added.) The juvenile court found:

> No parent has maintained significant and meaningful contact with the children during the previous six consecutive months because they have not made reasonable effort to resume care of the children in interest despite being given the opportunity to do so. Neither Mother nor [T.S.'s father] have adequately addressed their domestic abuse, substance abuse or mental health issues, and have not made a genuine effort to address these issues.

There is no dispute the two elements of section 232.116(1)(e)(1), (2) have been satisfied. Leanne's argument is that section 232.116(1)(e)(3) has not been satisfied. That subparagraph has two requirements: "the parents (1) have not maintained *significant and meaningful contact* with the child during the previous

six consecutive months and (2) have made *no reasonable efforts* to resume care of the child despite being given the opportunity to do so." Iowa Code § 232.116(1)(e)(3) (emphasis added). With respect to maintaining significant and meaningful contact, our review of the record shows that of approximately forty-six visits Leanne has been offered over the life of this CINA case, she has missed or cancelled eight. Leanne was consistently prepared for the visits with food and toys for the children. She occasionally provided them clothing. Leanne affirmatively asked for K.G. to have a cell phone so that she and Leanne could communicate. If not for the statutory definition of "significant and meaningful contact" our analysis might end here. But, section 232.116(1)(e)(3) requires an affirmative duty on the parent to make "a genuine effort to complete the responsibilities prescribed in the case permanency plan." Although Leanne has engaged in some services and has participated in visitation, our discussion under the paragraph (h) analysis above regarding T.S. clearly demonstrates that Leanne has not made a genuine effort to complete her responsibilities as prescribed in the permanency plan. Accordingly, she has not satisfied the requirement of significant and meaningful contact.

We turn now to the second requirement to determine whether the State proved by clear and convincing evidence Leanne has "made no reasonable efforts to resume care" of K.G. We consider the "no reasonable efforts" clause in the context of subparagraph (e)(3). Out of context, one might think that a parent who makes any reasonable effort to resume care could not be found to have "made no reasonable efforts." If that were so, then any single act which might

constitute a reasonable effort would avoid a termination under (e). We do not believe the legislature intended such a result. The two requirements of subparagraph (e)(3) are clearly in the conjunctive: connected, joined together. Each is separately required, but they are considered closely interconnected. Having already found that Leanne had not made a genuine effort to complete the responsibilities prescribed in the case permanency plan, thus having failed to satisfy the requirement of significant and meaningful contact, we now consider her conduct as a whole to see if she has done anything which rises to the level of "reasonable efforts to resume care" of K.G.

Obviously, this requires a qualitative analysis of her efforts—a look at the substance of her conduct, not just the form. Some of her conduct was reasonable: attending some domestic abuse classes, frequent child visitation, appropriate preparation for visitation, and attempting to provide certain physical needs such as clothing and a cell phone. But the substance of her conduct belies any appearance of reasonable efforts to resume care: denial of substance abuse, failed drug testing, failure to participate in inpatient treatment, failure to complete outpatient treatment, lying to treatment providers, repeated violation of no contact orders, instructing K.G. to delete text messages that would have revealed Leanne attempting unauthorized visitation, lying to K.G.'s care providers, and stating an intent to conceal future domestic abuse events.

We agree with the juvenile court that Leanne has made no reasonable efforts to resume care of K.G. despite having been given the opportunity to do so. Accordingly, we affirm termination under section 232.116(1)(e).

### iii.      <u>Paragraph (h).</u>

Leanne contends the court erred in terminating her parental rights to K.G. pursuant to section 232.116(1)(h).  We note that under "Order," the juvenile court stated, "[T]he maternal rights and relationship of Leanne, with respect to [K.G.] and [T.S.], are permanently terminated as provided for by Iowa Code sections 232.116(1) (d), (e), and (h)."  However, in substance, the juvenile court ruling discussed paragraph (h) only in relation to T.S., and K.G. does not fall within paragraph (h)'s age range.  Consequently, it is clear the court did not terminate Leanne's parental rights to K.G. pursuant to paragraph (h).

### *b.*      *Kirk's Parental Rights to K.G.*

### i.      <u>Paragraph (b).</u>

The juvenile court terminated Kirk's parental rights to K.G. under paragraphs (b) and (e).  As recited above in this opinion:

> Prior to Leanne and John moving to Iowa in November 2012, Kirk had been paying child support to Leanne for K.G. and exercising visitation each weekend.  After moving to Iowa, Kirk continued paying child support but did not see K.G. regularly.  He was in contact with her over the phone or by text.  He did not inquire into K.G.'s new living environment.  She did, however, spend three months in the summer of 2013 with Kirk in Colorado.

Further, it appears from the record that Kirk had intended to exercise some visitation with K.G. in Colorado at Christmas time in 2013 and in the summer of 2014.  However, DHS denied the Christmas visitation because of the juvenile court proceedings and, given the June 6 and 9, 2014 termination-of-parental-rights trial, it appears obvious why there was no summer visitation.

In order to terminate under paragraph (b), the juvenile court was required to find "that there is clear and convincing evidence that the child has been abandoned or deserted." Iowa Code § 232.116(1)(b).

> "Abandonment of a child" means the relinquishment or surrender, without reference to any particular person, of the parental rights, duties, or privileges inherent in the parent-child relationship. Proof of abandonment must include both the intention to abandon and the acts by which the intention is evidenced. The term does not require that the relinquishment or surrender be over any particular period of time.

*Id.* § 232.2(1).

"Desertion" mean

> intention to desert, but is evidenced by the lack of attempted contact with the child or by only incidental contact with the child.

*Id.* § 232.2(14).

Kirk's regular payment of child support, his pattern of visitation and his occasional contact with K.G. by phone or text weigh against any finding that he had abandoned or deserted K.G. In fact, his level of involvement might be considered typical—but far from ideal—for a noncustodial out-of-state parent after the custodial parent moved two states away. On our de novo review we conclude the evidence does not support a finding by clear and convincing evidence Kirk abandoned or deserted K.G.

### ii.    Paragraph (e).

For our analysis of whether Kirk's parental rights should have been terminated under paragraph (e) we will use the same analytic framework as set

forth above under our discussion of Leanne's parental rights. There is no dispute that paragraphs (e)(1) and (2) have been satisfied,[3] so we will focus on (e)(3). The first requirement under (e)(3) is that "the parents have not maintained *significant and meaningful contact* with the child during the previous six consecutive months." Iowa Code § 232.116(e) (emphasis added). Our legislature has adopted specific requirements under subparagraph (e)(3) by defining "significant and meaningful contact":

> For the purposes of this subparagraph, "significant and meaningful contact" includes but is not limited to the affirmative assumption by the parents of the duties encompassed by the role of being a parent. This affirmative duty, in addition to financial obligations, requires continued interest in the child, a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with the child, *and* requires that the parents establish and maintain a place of importance in the child's life.

Iowa Code § 232.116(1)(e)(3) (emphasis added).

We start with a recitation of some of the facts as summarized by our colleague in his dissent:

> . . . From the time of K.G.'s birth until the parents' separation and divorce, Kirk and Leanne raised K.G. in a family unit. When the parents separated and divorced, Kirk paid child support and exercised visitation every other weekend. When Leanne left Colorado for Iowa in November 2012, the record shows Kirk exercised visitation in a manner not inconsistent with a noncustodial parent who does not reside in the same state as the child. K.G. lived with Kirk in Colorado for the entire summer of 2013. This is the first summer after Leanne moved K.G. to Iowa. Shortly after K.G.'s return from Colorado, this case commenced. Kirk had planned to exercise visitation over winter break in 2013, but IDHS disallowed the visitation because of this case.

---

[3] Section 232.116(1)(e)(1) requires a CINA adjudication; (e)(2) requires at least six months removal from physical custody of parents.

> Presumably, summer visitation in 2014 also would have been disallowed for the same reason.
>
> . . . .
>
> . . . Kirk has assumed the duties of parenthood one would expect of a noncustodial parent who resides in a different state than the child. Kirk has paid child support since the divorce. He is current on his child support obligations. *See* Iowa Code § 232.116(1)(e)(3) (identifying satisfaction of "financial obligations" as duty of parent). He has maintained continued interest in the child. *See id.* (identifying "continued interest" as a factor). Kirk communicated with his daughter by telephone and text message on a regular basis. *See id.* (identifying "genuine effort to maintain communication with the child" as a parental duty). In addition to his communication directly with K.G., Kirk also communicated regularly with the mother regarding K.G.'s welfare. Kirk sent K.G. Christmas and birthday gifts. He has sent gift cards to K.G. and T.S., even though T.S. is not his child. He also provided K.G. with an Easter basket almost every year of her life because "she's big time on Easter." . . . [T]here is no evidence that Kirk has not maintained a central place of importance as a parent in this child's life.

We agree that Kirk has met his financial obligations by paying child support. He has shown continued interest in K.G. by maintaining some phone and text contact with her. Although he had no visitation with her after removal from her mother's care, under the facts of this case we will not consider that to his prejudice. Instead, we focus on whether he has satisfied two other components of the statutory definition: "the affirmative assumption by the parent[] of the duties encompassed by the role of being a parent," and "a genuine effort to complete the responsibilities prescribed in the case permanency plan." A more thorough review of the proceedings will help guide us through this analysis.

In October 2013, K.G. was removed from the mother's home. CINA proceedings were commenced. Kirk received notice of the proceedings, notice of his right to counsel, and notice that failure to appear for the CINA hearings might result in an adjudication and a disposition requiring foster care. Kirk came

to the adjudication hearing on November 7-8 but did not request counsel. On November 19, 2013, the DHS worker mailed to Kirk the Social History Questionnaire and informed him he needed to provide the completed questionnaire as soon as possible. During the entire course of these proceedings, Kirk never completed the questionnaire.

On December 9, 2013, the court held the disposition hearing as scheduled. The State submitted exhibit 10, a DHS report to the court dated December 9, 2013, which we presume to be the case permanency plan. The numbered recommendations of the report include: "Kirk [ ] make his intentions know to the Department of Human Services in regards to his daughter, [K.G.]." Kirk did not attend the disposition hearing and no counsel appeared for him. During the hearing, the court attempted to contact him by telephone, but there was no answer. The case permanency plan was adopted by the court and all parties were ordered to comply with its terms. Under the findings of fact portion of the order, the court found:

> The Court inquired of the parties as to the sufficiency of services being provided and whether additional services are needed to facilitate the safe return to or maintenance of the children in the home. Based on this inquiry, the Court finds the following additional services were requested: no additional services were requested by the parties.

The court later explained, "The Court advised the parties that failure to identify a deficiency in services may preclude the party from challenging the sufficiency of services in a termination of parental rights proceeding." Under the Order heading the court recited: "**The parent(s) are informed that the consequences of a permanent removal may include termination of the parent's rights with**

**respect to the children.**" (The original is in bold print.) Prior to the termination hearing, Kirk never made a request for appointment of counsel or the provision of services and never reported any claimed deficiencies in services.

A permanency hearing/review hearing was scheduled for April 4, 2014. The State submitted exhibit 22, a March 28, 2014 report to the court prepared by DHS. Among the numbered recommendations was a repeat of a recommendation contained in the case permanency plan that Kirk make his intentions known to DHS. Also, the recommendations included that a termination of parental rights petition be filed by the county attorney's office with regard to T.S. At that time there was no recommendation to terminate the parental rights as to K.G.; but because of the affair that Leanne had with T.S.'s father during her marriage to Kirk, paternity testing was ordered to determine if Kirk was the father of K.G. Those results were pending at the time of the report. The report stated: "[Kirk] resides in Colorado. It has been reported that he smokes marijuana on a daily basis. [Kirk] has had minimal contact with this worker throughout the life of this case. He has stated that he wants the best for [K.G.]." Later, the report provided:

> In regards to [K.G.], due to her age more time is available to provide services for her to be reunified with her mother or father as that is the primary permanency goal for her. The concurrent plan for [K.G.] at this time is Another Planned Permanent Living Arrangement and Guardianship with the [current foster parents, the paternal grandparents of T.S.].

On April 4, 2014, the guardian ad litem filed a report agreeing with that DHS recommendation.

On May 9, 2014, the State filed a petition for termination of parental rights of Leanne and Kirk as to K.G. The court-appointed special advocate (CASA) submitted a report dated May 21, 2014, supporting the DHS recommendations to terminate Leanne's rights to T.S. and to K.G., without any reference to Kirk's parental rights. The permanency hearing was continued to June 5, 2014, but was later continued to coincide with the termination hearing set to commence on June 6. The petition for termination was set for hearing June 6 and 9, 2014. Kirk requested and received court-appointed counsel. He and his attorney appeared on June 6, and his attorney—not Kirk—appeared on June 9.

The court terminated Kirk's parental rights to K.G. In its termination order, the court included this summary in its findings of fact: "The Court finds the problem with [Kirk] is not that he has done anything overtly inappropriate or dangerous, but that fact he has simply done nothing, either to protect his child or make efforts to have her returned to his care." The court also included the following findings under its conclusions of law heading:

> [Kirk] has not taken any steps to regain custody of his child. He continues to use marijuana to treat chronic pain, knowing DHS cannot place the child in his custody, until he finds a medically appropriate alternative. He has not obtained a suitable place to live and admits he could not have the child placed with him until December 2014, at the earliest. He has financial constraints that prevent him from even visiting the child more than one time in the past three years. He has not spoken to the child's therapist about her current needs and was unaware of her recent hospitalization.

It is without dispute that Kirk's role in K.G.'s life has not changed during the time K.G. has lived in Iowa, including during the course of the court proceedings in this case. The question is: Should he have done more in

response to the CINA proceedings? This is not a moral question, but a legal question. The question might be reframed: What did the legislature intend that a noncustodial out-of-state parent must do in order to satisfy the requirement of an "affirmative assumption of the duties encompassed by the role of being a parent" when faced with a CINA adjudication and possible termination of parental rights? In the context of a CINA proceeding and impending termination proceeding, was Kirk required to do more than maintain his status quo as a noncustodial dad?

The following recitation from an unreported decision of our court provides a helpful summary of applicable law:

> While the State has an obligation to provide reasonable services to preserve the family unit, it is the parent's responsibility "to demand other, different, or additional services *prior* to the termination hearing." *In re S.R.*, 600 N.W.2d 63, 65 (Iowa Ct. App. 1999) (emphasis added); *In re H.L.B.R.*, 567 N.W.2d 675, 679 (Iowa Ct. App. 1997). Complaints regarding services are properly raised "at removal, when the case permanency plan is entered, or at later review hearings." *In re C.H.*, 552 N.W.2d 144, 148 (Iowa 2002). Where a parent "fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding." *C.H.*, 552 N.W.2d at 148. Similarly, we will not review a reasonable efforts claim unless it is raised prior to the termination hearing. *See In re L.M.W.*, 518 N.W.2d 804, 807 (Iowa Ct. App. 1994) (stating that a party challenging reasonable efforts must do so prior to the termination hearing).

*In re M.Y.R.*, No. 11–1139, 2011 WL 5389436, at *7 (Iowa Ct. App. Nov. 9, 2011). The foregoing quote balances the legal sufficiency of DHS "reasonable efforts" or sufficiency of services against the timing and sufficiency of a parent's duty to request or demand services. The legislative scheme is designed to require that parents whose children are subjects of a CINA case "step up their game" in order to avoid termination. Parents are given timely warnings—as was

Kirk in this case—that failure to take such steps may result in termination and they are given opportunities to request additional services or assistance. Simply put, a parent must *do* something, must make some effort to move; neither standing still nor cruise control on a status-quo path will defeat an impending termination.

Inherent in CINA proceedings is a requirement that parents who were the cause of the CINA determination are required to take certain affirmative steps to remedy the circumstances which gave rise to the adjudication. In other words, maintaining the status quo is not sufficient for such a parent. In the event only one of the parents was responsible for causing the CINA adjudication, the other parent cannot refuse to assist in the remediation and just stand on the sideline and observe. That is the directive the legislature requires under section 232.116(1)(e)(3).

The dissent cites several cases involving fathers whose rights were terminated by the juvenile court, but were reversed by our court. A review of some of those cases helps demonstrate how intensely fact-based these cases are: whether to reverse or not is often based on a single, or seemingly minor fact or factor. In the case of *In re A.C.*, our court reversed a termination of a father after finding that he had requested additional visits and services, only two were provided to him, and he had made progress toward reunification by enrolling in substance abuse treatment, finding housing, and securing employment. No. 03-1314, 2003 WL 22455895, at *2 (Iowa Ct. App. Oct. 29, 2003). In the case of *In re K.P.*, we reversed after finding that "the mother repeatedly asserted she

required transportation assistance to facilitate visits with her daughter," and finding DHS did not furnish that single service that was critical to facilitating the mother's reunification. No. 11-0663, 2011 WL 3117780, at *2-3 (Iowa Ct. App. July 27, 2011). In the case of *In re J.C.*, the father had regularly had frequent visitation with the child, had previously sought custody of the child in district court, in those proceedings expressed willingness to take immediate custody of his child, and had a full-time job and a home that would accommodate the child. No. 14-0100, 2014 WL 1234432, at *2-3 (Iowa Ct. App. Mar. 26, 2014). The State failed to prove the father was in need of services to correct circumstances which led to the adjudication or that he was afforded services. *Id.* In the case of *In re A.L.*, we reversed on a finding that the father had not been served in the CINA proceedings and was served the termination petition about seven weeks prior to hearing, and alternatively, that the State had not satisfied the reasonable efforts requirement for termination. No. 14-0428, 2014 WL 2432421 (Iowa Ct. App. May 29, 2014).

As we compare the decisions in those cases with the facts in this case, we note that Kirk has had an opportunity to be involved in the proceedings from the start. He received notice and attended the CINA adjudication hearing. Between the time of that hearing and the disposition, DHS requested that he complete the Social History Questionnaire. He never did. He received notice of the disposition hearing, but did not appear or request counsel. The case permanency plan approved by the court at that hearing provided that Kirk would let his intentions concerning involvement with K.G. be known to DHS. He never

did so prior to the termination hearing.[4]  The order following the disposition hearing notified Kirk that all parties were ordered to comply with the case permanency plan, informed him the court found that no party was requesting additional services, advised him that failure to identify any deficiency in services might preclude a later challenge on that basis, and the consequences of permanent removal might result in termination of parental rights.  There is no evidence that Kirk ever complained of lack of services, requested additional services, inquired as to what he should or could do to help K.G. or preserve his own rights, and never notified DHS of his intentions.

Although a March DHS report and an April CASA report indicate a current plan for an alternative arrangement for K.G., including a long term guardianship, there is no indication that Kirk affirmatively influenced that plan.  It appears more likely a plan made out of uncertainty as to his intended involvement.  It is tempting to claim the DHS could have or should have done more with respect to Kirk, but how much more?  He failed to complete the social history questionnaire requested and needed by the department.  He was notified of all hearings.  He failed to appear for the disposition hearing and failed to request or to obtain counsel.  He was not available to participate in that hearing by phone.  There is no evidence of any communications he initiated with DHS or other service providers inquiring about K.G. or requesting or demanding services.  He attended only one of the two days of the termination hearing.

---

[4] Arguably, he finally did so at the termination hearing.

If Kirk were a resident of the same town in which K.G. resided, would we hesitate to find that he has failed to complete the responsibilities prescribed in the case permanency plan?  All he had to do was make his intentions known to DHS.  Would we hesitate to find that he has failed to affirmatively assume the duties encompassed by the role of being a parent?  We think the answer is "no" to each question.  What if he were a resident of Iowa, across the state from where K.G. lives?  How much does it matter that he lives in Colorado?  Depending on what was asked of him, perhaps it would matter; but in this case, he failed to even complete a questionnaire, failed to even timely let DHS know what he intended or wished his long-term involvement to be, and failed to request any assistance or services for seven months from the time of removal to the time of termination hearing.

Accordingly, on our de novo review we conclude the State has established by clear and convincing evidence that Kirk failed to affirmatively assume the duties of a parent as required under the circumstances in K.G.'s life and he failed to comply with—in this case, even respond to—the responsibilities prescribed in the case permanency plan, and that Kirk's rights should be terminated under section 232.116(1)(e).  We affirm the juvenile court on this issue.

## IV.    CONCLUSION.

With respect to Leanne, we find neither trial nor appellate counsel was ineffective.  We further find the expedited termination appeal process does not create a per se violation of terminated parents' due process rights.  With respect to the statutory grounds, we affirm termination of her parental rights to T.S. under

Iowa Code section 232.116(1)(h) and affirm termination of her parental rights to K.G. under section 232.116(1)(e).  With respect to Kirk, we find the evidence sufficiently supported termination of his parental rights to K.G. under paragraph (e).

**AFFIRMED ON BOTH APPEALS.**

Bower, J., concurs; McDonald, J., concurs in part and dissents in part.

**MCDONALD, J.** (dissenting)

I concur in the judgment with respect to the termination of Leanne's parental rights, but I dissent from the majority's opinion with respect to Kirk's parental rights. Kirk had not abandoned the child. Kirk maintained significant and meaningful contact with the child not inconsistent with what one would expect of a noncustodial parent not a resident of the state in which the child resides. The State never made any effort to provide Kirk with services or otherwise involve him in any meaningful way in this case because the primary, if not sole, focus of the Iowa Department of Human Services (IDHS) was to provide services to the mother and stepfather. When those efforts failed, Kirk was treated as flotsam of his ex-wife's wreckage.

I.

The State has the burden to prove the allegations of the petition by clear and convincing evidence. Iowa Code § 232.96. Clear and convincing evidence is more than a preponderance of the evidence and less than evidence beyond a reasonable doubt. *In re L.G.*, 532 N.W.2d 478, 481 (Iowa Ct. App. 1995). It means that there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence. *Id.* Because our review is de novo, we should not be passive where there is a deficient presentation of evidence. Instead, we must satisfy ourselves the State has come forth with the quantum and quality of evidence sufficient to prove the statutory grounds for termination of a parent's rights, a standard imposed to balance the parent's interest in maintaining the parent-child relationship and the State's obligation to

act *parens patriae*.  I conclude the State has not met its significant evidentiary burden in this case.

## II.

The first ground for termination requires the State to establish by clear and convincing evidence "that the child has been abandoned or deserted."  Iowa Code § 232.116(1)(b).  The majority concludes the State has not proved this ground for termination, and I agree.

## III.

## A.

The second ground for termination requires the State to first prove, as relevant here, Kirk has not "maintained significant and meaningful contact with the child."  Iowa Code § 232.115(1)(e)(3).  "'[S]ignificant and meaningful contact' includes but is not limited to the affirmative assumption by the parents of the duties encompassed by the role of being a parent."  *Id.*  I conclude the State has not proved by clear and convincing evidence that Kirk failed to maintain significant and meaningful contact with K.G.

It is necessary to provide some context regarding the history of this family. Kirk and Leanne married and tried unsuccessfully for a period of time to have children.  After Kirk and Leanne treated with medical providers, K.G. was born into the marriage.  From the time of K.G.'s birth until the parents' separation and divorce, Kirk and Leanne raised K.G. in a family unit.  When the parents separated and divorced, Kirk paid child support and exercised visitation every other weekend.  When Leanne left Colorado for Iowa in November 2012, the

record shows Kirk exercised visitation in a manner not inconsistent with a noncustodial parent who does not reside in the same state as the child. K.G. lived with Kirk in Colorado for the entire summer of 2013. This is the first summer after Leanne moved K.G. to Iowa. Shortly after K.G.'s return from Colorado, this case commenced. Kirk had planned to exercise visitation over winter break in 2013, but IDHS disallowed the visitation because of this case. Presumably, summer visitation in 2014 also would have been disallowed for the same reason. It is wholly disingenuous for the State to now argue Kirk failed to have more frequent visitation with the child when the State disallowed the father's visitation with the child—visitation the father exercised for years without interruption prior to the State becoming involved with this family because of Kirk's ex-wife's conduct.

In addition to exercising visitation with K.G. until the State prevented the same, Kirk assumed the duties of parenthood one would expect of a noncustodial parent who resides in a different state than the child. Kirk paid child support, and he is current on his child support obligations. *See* Iowa Code § 232.116(1)(e)(3) (identifying satisfaction of "financial obligations" as duty of parent). He maintained continued interest in the child. *See id.* (identifying "continued interest" as a factor). Kirk communicated with his daughter by telephone and text message on a regular basis. *See id.* (identifying "genuine effort to maintain communication with the child" as a parental duty). In addition to his communication directly with K.G., Kirk also communicated regularly with the mother regarding K.G.'s welfare. Kirk sent K.G. Christmas and birthday gifts. He

sent gift cards to K.G. and T.S., even though T.S. is not his child. He also provided K.G. with an Easter basket almost every year of her life because "she's big time on Easter." Most important, there is no evidence that Kirk has not maintained a central place of importance as a parent in this child's life. *See id.*

The majority nonetheless concludes the State proved this element because the affirmative assumption of parental duties includes the duty to obtain counsel and litigate the case. Kirk's litigation conduct, or lack thereof, has little relationship to whether he had "significant and meaningful contact with the child." If anything, Kirk's litigation conduct seems more probative of the "reasonable efforts" element, discussed below. By focusing on Kirk's litigation conduct, the majority has effectively incorporated the "reasonable efforts" element back into the "significant and meaningful contact" element. That simply confuses two issues the majority concedes are separate:

> That subparagraph has two requirements: "the parents (1) have not maintained significant and meaningful contact with the child during the previous six consecutive months and (2) have made no reasonable efforts to resume care of the child despite being given the opportunity to do so."

*Ante*, at 20; *See ante*, at 21 ("The two requirements of subparagraph (e)(3) are clearly in the conjunctive: connected, joined together. Each is separately required . . ."). Accordingly, I conclude Kirk's failure to immediately retain counsel and aggressively litigate a case that had nothing to do with his conduct and everything to do with his ex-wife's conduct is not probative of the whether Kirk maintained "significant and meaningful contact" with his child.

The majority also concludes the State proved this element because Kirk failed to make a "genuine effort to complete the case permanency plan." It should be noted that there is no exhibit or document entitled "case permanency plan" in this record. The majority "presumes" a report to the court submitted during the disposition hearing held on December 9, 2013, was, in fact, the case permanency plan. We should not terminate a parent's rights on the ground the parent failed to comply with the "case permanency plan," which is a statutorily defined term, *see* Iowa Code § 232.2(4), when we cannot find the "case permanency plan" in the record. If the report to the court is the case permanency plan, it sets forth fourteen recommendations for the family, only one of which directly relates to Kirk. The report to the court states Kirk shall make his intentions regarding K.G. known. The report contains no deadline for Kirk to make his intentions known.

In April 2014, the juvenile court was to hold a permanency hearing with respect to K.G. The court continued the hearing until June 2014. Subsequently, on May 21, 2014, the State filed its petition to terminate Kirk's parental rights. In response, the juvenile court cancelled the permanency hearing and instead scheduled a termination hearing for June 2014. Within several days of the petition to terminate parental rights being filed, Kirk retained counsel to resist the termination of his parental rights. It cannot be underemphasized that there was no substantive hearing regarding K.G. or Kirk between the time of the disposition hearing in December and the time of the termination hearing in June. Thus, between the time of the December disposition hearing and the time of the next

hearing Kirk made known his intentions to maintain his parental rights to K.G. He therefore complied with all of the terms and conditions of the case permanency plan, or court report, that applied to him.

Considering all the facts and circumstances, I conclude the State has failed to prove this element by clear and convincing evidence.

B.

In addition to proving the lack of significant and meaningful contact, the State is required to prove by clear and convincing evidence that Kirk "made no reasonable efforts to resume care of the child despite being given the opportunity to do so." Iowa Code § 232.116(1)(e)(3). This requires proof the State provided the parent with the opportunity to resume care of the child, including offering appropriate and adequate services, and the parent failed to avail himself of the services offered. *See In re A.C.*, No. 03-1314, 2003 WL 22455895, at *2-3 (Iowa Ct. App. Oct. 29, 2003) (reversing termination of father's rights where State failed to prove it offered meaningful services to father). As previously discussed, this element is separate and distinct from the "significant and meaningful contact" element. The State's failure of proof as to this element is thus an independent ground for vacating the juvenile court's termination order.

The juvenile court concluded termination is warranted because Kirk did not make "reasonable efforts to resume care of the child [after] being given the opportunity to do so." Specifically, the juvenile court faulted Kirk for his failure to take legal action upon the opening of this case. The juvenile court's conclusion that Kirk should have been more legally proactive within the CINA case

erroneously places the burden of proof on Kirk. *See In re J.C.*, No. 14-0100, 2014 WL 1234432, at *3-4 (Iowa Ct. App. Mar. 26, 2014) (rejecting State's position that termination was proved because father should have done more to seek custody of child during CINA proceedings). In addition, the narrow focus on whether Kirk was actively involved in the litigation glosses over an important element of proof: to establish the element, the State is required to prove Kirk failed to make reasonable efforts to resume care of K.G. after "being given the opportunity to do so."

In reviewing this file, it is clear IDHS did not give Kirk a meaningful opportunity to resume care of the child. IDHS's focus was to provide services to Leanne and John to facilitate their reunification with the child. The services offered this family related almost exclusively to domestic violence and methamphetamine abuse. Those services were wholly inapplicable to Kirk. IDHS admitted that it did not seek services for Kirk, stating in a report that "Kirk had no involvement in services due to living in Colorado." I do not in any way fault IDHS for focusing its efforts on Leanne and John. IDHS's charge is to take action in the best interest of the child. Leanne and John were K.G.'s custodial parents within the State's jurisdiction and the persons whom the State could most effectively provide services to facilitate reunification. The fact that IDHS's focus was well-intentioned and well-placed, however, does not relieve the State of its burden of proving by clear and convincing evidence that the State gave Kirk a meaningful opportunity to resume care of his child under this statutory ground for termination.

The reality of this case is that it was never about Kirk until it was. At that point, it was too late for him in IDHS's view. Under these circumstances, I would hold the State failed to prove by clear and convincing evidence that it provided Kirk with any meaningful opportunity to resume the care of K.G. *See In re A.L.*, No. 14-0428, 2014 WL 2432421, at *4 (Iowa Ct. App. May 19, 2014) (reversing termination order and holding the State failed to prove the father "was given the opportunity to do so" "because no reunification services were provided while the child-in-need-of-assistance action was pending" and explaining "services offered after the filing of the termination petition" do not satisfy the department's obligation to make reasonable reunification efforts); *In re J.W.E.L.*, No. 12-2309, 2013 WL 751305, at *4 (Iowa Ct. App. Feb. 27, 2013) (reversing termination where noncustodial low income father did not make attempts to resume care of the child until the end of the case because "the plan for reunification had focused solely on the mother until less than three months before the termination hearing"); *In re K.P.*, No. 11-0663, 2011 WL 3117780, at *2 (Iowa Ct. App. Jul. 27, 2011) (reversing termination where State failed to provide the single service necessary to facilitate reunification).

This case is very similar to *J.C.*, 2014 WL 1234432. In that case, the juvenile court terminated the noncustodial father's parental rights on several grounds, including section 232.116(1)(e). We concluded that the State failed to prove its case. *Id.* at *2. As in this case, the father in *J.C.* had exercised visitation consistent with that of a noncustodial parent. *See* 2014 WL 1234432, at *3 ("There is nothing to suggest he abdicated the role of noncustodial

parent."). As in this case, the State contended the "father should have stepped forward to seek custody of the child during the child in need of assistance proceeding." *Id.* Our court explained that the argument impermissibly shifted the burden of proof to the father. Further, our court explained that the father's lack of involvement in the case was because "[v]irtually all the department's reunification efforts were directed at the mother." *Id.* The same is true of this case. Ultimately, the *J.C.* court concluded the State failed to prove grounds for terminating the father's parental rights pursuant to paragraph (e). *Id.* at \*2-3. The same result should obtain here.

## IV.

I conclude the State failed to prove grounds for termination by clear and convincing evidence. At minimum, the evidence in this case is in equipoise, and the tie goes to the runner. I respectfully dissent with respect to the termination of Kirk's parental rights.