# IN THE COURT OF APPEALS OF IOWA

No. 19-0444
Filed May 13, 2020

**IN THE INTEREST OF B.R.,**
**Minor Child,**

**T.T., Mother,**
    Petitioner-Appellee,

**J.R., Father,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Louisa County, Emily Dean, District Associate Judge.

A father appeals the termination of his parental rights under Iowa Code chapter 600A (2018). **AFFIRMED.**

Shawn C. McCullough of Powell & McCullough, PLC, Coralville, for appellant father.

David L. Matthews of Hicklin & Matthews, Wapello, for appellee mother.

Timothy K. Wink of Schweitzer & Wink Law Firm, Columbus Junction, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Greer and Ahlers, JJ.

**GREER, Judge.**

J.R. appeals the termination of his parental rights to his child, B.R.[1] This father asserts that he did not abandon his child and that termination is not in the child's best interests. We address each argument separately.

The mother and J.R. had an on-again, off-again relationship during the child's life leading up to May 2017, when they "split . . . up for good." J.R. would see the child if the mother initiated it. In early May 2017, J.R. assaulted the mother. This marked the second assault on the mother within a one-year period. As a result of the assault, J.R. was jailed for domestic abuse assault and a no-contact order was issued in the criminal case. He remained in jail through the time he pled guilty to and was sentenced for domestic abuse on July 12, 2017. At sentencing, the no-contact order was extended through July 12, 2018. J.R. remained in jail until late September 2017, at which time he was transferred to a residential correctional facility, or "halfway house," until January 2018. J.R. testified he could see the child on "my time off I got out of the halfway house," but he never did. No contact occurred between father and child after May 2017.[2] After the expiration of the no-contact order, the father then contacted the mother on social media seeking reconciliation and a time with the child. Not wanting any contact, the mother blocked J.R. on social media. J.R. made no other attempts to contact the mother or the child.

---

[1] The child was born in February 2015 and was four years old at the time of trial. The parents never married.

[2] While the father made no effort to see the child, visits occurred with the father's sister and her children until September 2017.

On August 8, 2018, the mother petitioned to terminate J.R.'s parental rights to their child. In September, the father contacted an attorney but chose to not retain him or file any motion seeking visitation.[3] After a trial, the juvenile court terminated the father's parental rights. Finding J.R. had no bond with the child, had not financially or otherwise supported the child, and failed to pursue legal steps to have contact since May 2017, the juvenile court determined clear and convincing evidence existed to terminate the parental relationship.

To start, we review chapter 600A (2018) termination proceedings de novo. *In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998). "Although we are not bound by them, we give weight to the trial court's findings of fact, especially when considering credibility of witnesses." *Id.* "The primary interest in termination proceedings is the best interests of the child." *Id.* "We will uphold an order terminating parental rights where there is clear and convincing evidence of the statutory grounds for termination." *In re T.S.*, 868 N.W.2d 425, 431 (Iowa Ct. App. 2015). "Evidence is clear and convincing when there is no serious or substantial doubt as to the correctness of the conclusions of law drawn from the evidence." *Id.*

We examine whether the mother satisfied the two-step process to terminate parental rights under chapter 600A. *See In re Q.G.*, 911 N.W.2d 761, 770 (Iowa 2018). First, a petitioner must "show by clear and convincing evidence a threshold event has occurred that opens the door for potential termination of parental rights."

---

[3] J.R. provides conflicting testimony about contact with the attorney. At one point he offered that he went to the law firm four days after being served with termination papers. At another point, noting he could not remember the date, he thought it may have been four or five days before being served.

*Id.*; *accord* Iowa Code § 600A.8. "Once that threshold showing has been made, the petitioner next must show by clear and convincing evidence termination of parental rights is in the best interest of the child." *Q.G.*, 911 N.W.2d at 770. Here the juvenile court found the mother established the requisite proof of abandonment by J.R. by establishing he abandoned the child and failed to provide financial support without good cause.[4] *See* Iowa Code § 600A.8(3)(b). We agree.

---

[4] Iowa Code subsection 600A.8(3) provides, in relevant part, the following ground for termination:

> 3. The parent has abandoned the child. For the purposes of this subsection, a parent is deemed to have abandoned a child as follows:
>
> . . . .
>
> b. If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
>
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
>
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
>
> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.
>
> c. The subjective intent of the parent, whether expressed or otherwise, unsupported by evidence of acts specified in paragraph "a" or "b" manifesting such intent, does not preclude a determination that the parent has abandoned the child. In making a determination, the court shall not require a showing of diligent efforts by any person to encourage the parent to perform the acts specified in paragraph "a" or "b". In making a determination regarding a putative father, the court may consider the conduct of the putative father toward the child's mother during the pregnancy. Demonstration of a commitment to the child is not met by the putative father marrying the mother of the child after adoption of the child.

But the father blames his lack of contact on the mother, asserting she prevented him from access to the child. Other than blocking his one social media contact, J.R. points to no other effort by the mother to thwart his visitation. *Cf. In re H.N.M.*, No. 17-1802, 2018 WL 2731643, at *2–3 (Iowa Ct. App. June 6, 2018) (concluding abandonment not established where mother's systematic and substantial efforts made father's contact impossible). And because of the no-contact order, he argues he was restricted from contact. Even so we do not find this argument compelling. Except for one attempt at contact, he made no effort to contact the child, through the mother or otherwise, after the order expired. With no other effort to make contact, J.R.'s excuse is not persuasive. Finding the uncontroverted evidence established no monthly visits occurred with the child by the father for over twenty months, the court found clear and convincing support for termination under Iowa Code section 600A.8(3)(b).

Similarly, the father lacks any excuse for his failure to support the child financially. He has paid no monetary support for the child. There have been no cards sent, no gifts offered. Even though the father contacted an attorney, no steps were made to set up support payments or any structured visitation. Rather, J.R. chose to not act, waiting to "see what will happen here [in court]." The father has a job and pays support for his two other children. No good cause exists for lack of support for this child. The district court found clear and convincing evidence that the father contributed no financial support "of a reasonable amount, given the means available to him, over the last twelve months." This failure is undisputed in the record. *See, e.g.*, *In re K.W.*, No. 14-2115, 2015 WL 6508910, at *3 (Iowa Ct. App. Oct. 28, 2015) (providing "[u]nder section 600A.8(3)(b), the threshold element

of 'substantial and continuous or repeated contact' is economic contributions" and determining the court need not even consider whether the mother prevented the father from having regular contact with the child since the father was deemed to have abandoned his child under the financial-support element).

J.R. emphasizes two instances where the mother blocked contact—one on social media with J.R. and one ending contact with J.R.'s sister. We note J.R.'s contact with the mother was blocked by choices he made. *See, e.g.*, *In re K.M.*, No. 14-1374, 2015 WL 1849508, at *4–5 (Iowa Ct. App. Apr. 22, 2015) (finding a no-contact order is no excuse for relinquishing parental duties); *In re W.W.*, 826 N.W.2d 706, 710–11 (Iowa Ct. App. 2012) (finding injunction prohibiting contact with other parent did not explain failure to pursue other ways to engage the children, such as financial support or seeking visitation through legal means). Furthermore, even after the no-contact order expired and the mother blocked one attempt at contact, J.R. took no further action to see the child. As to the sister providing a means for contact, in the months she had access to the child, there is no evidence she helped arrange any contact between J.R. and the child. Thus proof of only one blocked effort to access visitation, in light of J.R's minimal efforts to reestablish contact, cannot establish efforts by the mother to prevent contact within the meaning of section 600A.8(3)(b)(1). *See K.M.*, 2015 WL 1849508, at *5–6 (providing history of abuse toward mother provided reasonable excuse for nonresponse to social media requests for contact).

Likewise we acknowledge economics might impact efforts to seek visitation. While J.R. lamented he might be "throwing money down the drain" to pursue a legal course to visitation, he did not say he could not afford that quest. The length

of incarceration undoubtedly impacted J.R.'s financial means. But, while four of the months were spent in a jail cell, in the remaining four months until release, J.R. resided in the "halfway house" where he presumably had work requirements.[5] And following the release from the residential facility in January 2018 until April 2019 (the time of trial), J.R. offers no explanation for his inaction in contacting the child through other sources, on seeking visitation through legal efforts, or on paying of any form of financial support. Through his inaction, J.R. rejected "duties imposed by the parent-child relationship." *In re C.A.V.*, 787 N.W.2d 96, 101 (Iowa Ct. App. 2010).

Finally the father maintains the best interests of the child support his continued involvement. But the juvenile court noted the child "is four years of age and does not have a bond or any type of relationship with his biological father." We defer to the juvenile court's finding. *See In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). Instead, the child refers to the mother's husband as "dad" or "daddy." The mother's husband testified to his close bond with the young child and his desire to adopt the child. Contrast that day-to-day care with the father's failure to have any contact with the child since May 2017. We find no support for any father-child bond between this child and J.R. and determine the child's best interest supports termination of the father's parental rights.

We affirm the juvenile court order terminating the father's parental rights.

**AFFIRMED.**

---

[5] At trial, J.R. testified he was a welding supervisor at a manufacturing plant.