# IN THE COURT OF APPEALS OF IOWA

No. 20-0793
Filed September 23, 2020

**IN THE INTEREST OF I.N. and N.N.,**
**Minor Children,**

**A.N., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Barbara H. Liesveld,

District Associate Judge.


        A mother appeals the termination of her parental rights.  **REVERSED AND**

**REMANDED.**


        Annette F. Martin, Cedar Rapids, for appellant mother.

        Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant

Attorney General, for appellee State.

        Kimberly A. Opatz of Linn County Advocate, Inc., Cedar Rapids, attorney

and guardian ad litem for minor children.


        Considered by Mullins, P.J., Greer, J., and Blane, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2020).

**BLANE, Senior Judge.**

A mother appeals the termination of her parental rights to two children, ages eight and two.[1] She contends that the State failed to show clear and convincing evidence of the statutory grounds for termination; it was not in the children's best interests to terminate her rights; and termination will be detrimental to the children because of their strong parent-child bond.

We find the evidence the State presented did not meet the threshold of clear and convincing evidence to support termination. So, we reverse and remand for further proceedings in the juvenile court.

## I. FACTS AND PRIOR PROCEEDINGS

The family came to the attention of the department of human services (DHS) in July 2017 with allegations about I.N. playing outside alone. Further investigation led to concerns about the mother having unsafe individuals living in her home including people with drug-abuse histories. When DHS performed testing on I.N. and the mother, the mother tested negative for all substances, but I.N. tested positive for ingested cocaine. DHS concluded I.N. was exposed to cocaine from the mother's roommates. At the time, DHS also found a razor blade next to the mattress where the mother and I.N. slept; the mother said it belonged to a roommate and criticized the roommate for "leaving these laying around" after being told to stop.

In August, DHS received another report of the mother possessing a sandwich bag of a white powdery substance, which turned out to be laundry

---

[1] The children have different fathers, neither of whom participate in this appeal.

detergent. The mother agreed to a safety plan that included not allowing anyone in her home or around I.N. that used drugs and seeking approval before living with anyone. She subsequently removed some of her roommates who she knew were abusing drugs in the house.

In March of the following year, she gave birth to N.N. During a safety check, DHS discovered two men in the home. DHS was concerned because one of the men lost his parental rights to his children and had a long criminal history. DHS also noted the mother needed reminders to clean and pick up her apartment so it was safe for N.N. to be on the floor. The mother lost her housing after being unavailable for an inspection—a requirement of her Section 8 housing—and was going to be removed after her lease expired.

In May, the children were adjudicated in need of assistance (CINA). The mother has mental-health diagnoses including depression, PTSD, and Asperger's syndrome within the autism spectrum. The juvenile court ordered services, and DHS provided several, cognizant of the mother's intellectual and mental-health barriers. Case plan goals included: attending therapy and managing her medication; obtaining employment; and maintaining appropriate housing.

Then, in October, the children were removed from the mother and placed with a foster family. DHS cited the mother's homelessness, prior unsanitary home conditions, lack of appropriate supervision, and the mother allowing inappropriate people to be in the home and around the children. In general, DHS reported little progress despite services being provided to the mother. Services provided include transportation assistance because the mother did not drive, cleaning assistance, parenting skills, therapy, medication management, and housing referrals.

After the removal, visitations were held in the foster parents' home and were unsupervised. But, in March 2019, DHS moved visits out into the community and changed them to full supervision because the mother explained she spent time with a registered sex offender at the homeless shelter where she was then living. The mother stated she understood she could not have the children with her while seeing this person and had not done so.

During visitations, the mother struggled with disciplining the children appropriately, and the DHS worker expressed concerns that she was unable to supervise both children at once. The mother got permission for her friend, Jessica, to attend one hour of one visit each month. In September, the mother signed a lease on an apartment with Jessica as her roommate. Visits began to take place in their apartment. But workers were unhappy with the cleanliness of the cluttered home and found Jessica to be an intrusive roommate.

In November 2019, roughly thirteen months after the final removal, the State filed a petition to terminate the mother's rights. Following the March and May 2020 hearings, the juvenile court terminated the mother's parental rights to eight-year-old I.N., pursuant to Iowa Code section 232.116(1)(f) (2019), and to two-year-old N.N., pursuant to Iowa Code section 232.116(1)(h). The mother appeals.

## II. SCOPE OF REVIEW

We review juvenile court proceedings de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). The juvenile court's fact findings do not bind us, but we give them weight, particularly on credibility. *Id.* Our primary concern is the best interests of the children. *In re L.T.*, 924 N.W.2d 521, 529 (Iowa 2019).

## III. ANALYSIS

### A. Statutory ground for termination

The mother contends the juvenile court erred in terminating her parental rights to I.N., under Iowa Code section 232.116(1)(f), and to N.N., under Iowa Code section 232.116(1)(h). Paragraphs (f) and (h) share a common element: the State must show by clear and convincing evidence that the child cannot be returned to the parent's custody at the present time. Iowa Code § 232.116(1)(f)(4), (h)(4). It is this element the mother challenges. "[A] child cannot be returned to the custody of the child's parent under section 232.102 if by doing so the child would be exposed to any harm amounting to a new child in need of assistance adjudication." *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992). "The threat of probable harm will justify termination, and the perceived harm need not be the one that supported the child's initial removal from the home." *Id.*

The mother argues there is not clear and convincing evidence that the children could not be returned to her at the time of the termination hearing.[2] She points out she has obtained stable housing and employment; she attends mental-health therapy regularly and takes her medication; and she has substantial visitation each week that is only minimally supervised. It is true the mother has been working at a fast-food restaurant and has maintained that steady employment since January and her housing since September. The State does not disagree

---

[2] The mother argues in her petition on appeal that she should have been given more time to work toward reunification, but we do not see where she made such a request below, and the juvenile court did not address it. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

that she is attending her mental-health therapy and managing her medication. And the mother has never had substance-abuse issues; domestic-violence issues have not played a role in these proceedings either.

The State maintains the mother is not making significant progress in any of the areas of concern; we cannot agree with this characterization. The State identifies the main concerns in this case as: (1) inconsistent housing, (2) unsanitary home conditions, (3) a lack of parenting skills and appropriate supervision for the children, and (4) the mother allowing inappropriate people to be in the home and around the children.

### 1. Housing

While the mother admitted she lost her housing in early 2019 due to her own actions, she was able to obtain a new residence. She also has had the same job since January 2019, which has helped her pay her rent and meet her financial obligations. With her steady employment, she has been able to overcome her earlier housing instability. In her new home, she has a separate bedroom prepared for the children, including their own beds. A DHS worker testified the room was clean and ready for the children.

### 2. Sanitary Home Conditions

True, the cleanliness of the home has been an issue since visits began there. Immediately, the DHS worker noticed the home was unkempt. The pet rabbit left droppings in the living room, the rooms were cluttered, and there were dirty dishes in the sink. At the outset of some visits, workers noted the home was picked up and clean; at others, clutter was still apparent. Still, the mother progressed to semi-supervised visits three times per week. At first, this included

safety checks at thirty-minute intervals but eventually DHS reduced these to once an hour. Generally, workers found the children to be playing appropriately at each check-in. The mother admits she has trouble keeping the place picked up. DHS workers noted a few specific safety issues. Twice, Jessica's tobacco and rolling papers were left on the kitchen table. Once, a knife was left out after preparing a meal. Beyond that, although workers routinely noted a cluttered home, despite regular walk-throughs and safety checks, they expressed no safety concerns. During the modified semi-supervised safety checks, the children were routinely observed playing with toys, watching videos, or interacting with the mother in a safe and appropriate manner, and no unapproved people were present in the home. DHS also never changed the location for visitation to outside the mother's home and reduced the level of supervision twice. The cluttered status of the home did not actually raise any safety flags for DHS.

### 3. Supervision and Parenting

DHS also alleges the mother overfeeds the children and feeds them inappropriate foods. It is true on one occasion, the mother fed the children pizza and had to be reminded that I.N. was on a newly-instituted gluten-free diet. Later, the mother adjusted what she fed the children by switching to gluten-free macaroni and cheese noodles. At the time, she continued to use the cheese sauce packet that came with the gluten-free noodles. When the DHS worker objected based on I.N.'s "issues with dairy," the mother observed he had eaten the same sauce before without trouble. But on a future visit, she made the children cookies without milk in recognition of this. By the end of the year, I.N.'s doctor determined he no longer had a gluten sensitivity.

On other occasions, DHS workers criticized the mother for feeding the children fast food—which she frequently got from the fast-food restaurant where she works—and Lunchables. During those times when visitations were occurring in the community (often at the public library), it seems reasonable to bring convenience food that is not necessarily the most healthy. At the termination hearing, the DHS worker testified the concern was that I.N. was pre-diabetic; but we see no medical guidance or opinion in the record indicating eating a fast food meal is a major safety concern. Later, when visits took place in her own home, the mother cooked for the children and fed them healthier snacks, like grapes and apples. Overall, we find DHS's concerns about how the mother fed the children were overblown and not strongly related to an actual safety or health concern.

Next, DHS was concerned about the mother's mental-health diagnoses and felt they contributed to her lack of self-care skills, which carried over into providing basic supervision and care for the children. These concerns were particularly acute when visitation was held out in the community, and DHS workers felt the mother could not handle supervising both children at once. As a reminder, N.N. was little more than a toddler during that period, and a child that young naturally demands more close attention. In addition, I.N. is a high-energy, special-needs child with mental-health diagnoses of ADHD and autism. He acts out and throws tantrums—often his behaviors would manifest as walking away from where the mother and N.N. were playing, wandering around the library, and using a too-loud voice. DHS workers reported the mother often did not correct these misbehaviors or used inappropriate discipline to correct them, usually by yelling at I.N., which was not effective. More recently, as I.N. has attended therapy and gotten

medication, the behaviors have lessened. Given N.N.'s young age and I.N.'s unique behavioral challenges, we are not surprised the mother struggled. But what is absent from the record is any significant concern for the children's well-being or safety as a result of the mother's struggles.

DHS expressed other concerns about the mother's parenting skills, including the opinion that she needs to learn how to "dress the children appropriately." This was connected to one time when the mother did not help the younger child put on his coat before going outside, assuming he could do it on his own. Early on in visitations, the mother would spend excessive time on her cellphone, but nothing of that nature was stated in recent reports. Routinely checking N.N.'s diaper was a concern through most of the case; but interaction notes indicate the mother changed N.N.'s diaper on her own about as often as when prompted. In February 2020, however, the foster mother reported frustration about having to ask the mother to check N.N.'s diapers. The mother's lack of attention to that detail remained a problem throughout the case and presents a gap in her parenting skills.

But we conclude, generally, the mother's parenting deficiencies do not significantly lessen the quality of care she can provide. The mother generally provided adequate food for the children and adjusted according to their needs. Although she struggled to keep an eye on both of them at all times or get them to play together, given the unique challenges, it would have been a struggle for anyone. She also set up I.N.'s mental-health treatment and the children's routine doctor and dental appointments and attended all those appointments.

### *4. Inappropriate Associates and Roommates*

Finally, DHS remains concerned about the mother's choice of roommates and the potential that she will allow individuals who are unsafe for the children around them. On our review, the mother has made significant progress in this area. She no longer associates with people who are violent or abuse drugs. While she spent time in the homeless shelter with someone on the sex offender registry, she never had the children around him, and she has left those kinds of associations in the past. She also recognized the importance of being more watchful about those relationships. The greatest concern now is with Jessica.

For some time now, the mother has not been permitted to allow people around the children without DHS approval; DHS approved her roommate, Jessica, and never withdrew the approval. The mother was aware Jessica had her rights terminated at birth to a now-seventeen-year-old child and voluntarily terminated her rights to a second child, now sixteen years old.

But workers were more concerned that during visitation, Jessica tended to speak over the mother. DHS alleged Jessica takes over and will not let the mother answer questions or be the primary parent. But this is not reflected in the interaction reports. On several occasions, Jessica was observed to be preparing dinner or snacks for the children but would then go to her room, as instructed, for the remainder of the visit. On a few occasions, she would remain outside and talk with the workers. Once, while the mother gave a tour of the improvements to the children's bedroom, Jessica repeatedly interrupted the mother. The mother asked Jessica to be quiet and let her talk, indicating the mother understands Jessica's place during visitation and has made attempts to correct Jessica's behavior. The

DHS worker also testified the mother is getting better at "telling Jessica she needs to take a step back." The mother testified Jessica is depressed and does not pick up after herself, exacerbating the cleanliness issues in the house. The mother also testified she recognizes Jessica is not helpful during visitations and she needs to find a new place on her own as soon as her lease expires. She plans to do so in August. Jessica has minimally impeded the mother's ability to demonstrate she is capable of caring for the children by herself during visitations. But, Jessica continues to be in the home during visitation, and no issues have been reported during safety checks or drop-ins.

DHS also expressed concern about the mother's latest request to have a friend who needed a place to stay sleep on her couch. DHS told the mother her friend could not be present during visitations, which upset the mother. The record does not show what specific concern there might have been about this particular friend.

### 5. Discussion

The children had been out of the mother's custody for a little over one year when the termination hearing began. And we generally treat those cases where children have been out of parental care beyond the statutory limits with a sense of urgency. *See In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000). At the same time, parents have a fundamental interest in the care and custody of their children. *See In re T.S.*, 868 N.W.2d 425, 432 (Iowa Ct. App. 2015). It is the State's burden to prove the ground for termination by evidence that is clear and convincing. *In re M.S.*, 889 N.W.2d 675, 679 (Iowa Ct. App. 2016) (citing Iowa Code § 232.96). "Clear and convincing evidence is more than a preponderance of the evidence and

less than evidence beyond a reasonable doubt." *Id.* "It is the highest evidentiary burden in civil cases." *Id.* "It means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *Id.*

On our de novo review, we find the State did not meet its burden to show by clear and convincing evidence that the children could not be returned to the mother at the present time because to do so would expose them to harm amounting to a new CINA adjudication. *See* Iowa Code § 232.116(1)(f)(4), (h)(4); *M.M.*, 483 N.W.2d at 814; *see also In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014) (interpreting "at the present time" as used in section 232.116(1) to mean "at the time of the hearing").

Reading the definition of a CINA, we conclude the following conditions are relevant to this case. The children will still be in need of assistance if any of the following are true:

(1) If they "suffered or [are] imminently likely to suffer harmful effects as a result of" "[t]he failure of the child[ren]'s parent, guardian, custodian, or other member of the household in which the child[ren] reside[] to exercise a reasonable degree of care in supervising the child[ren]." Iowa Code § 232.2(6)(c)(2).

(2) If the mother "fails to exercise a minimal degree of care in supplying the child[ren] with adequate food, clothing, or shelter and refuses other means made available to provide such essentials." *Id.* § 232.2(6)(g).

(3) If the mother's "mental capacity or condition, imprisonment, or drug or alcohol abuse results in the child[ren] not receiving adequate care." *Id.* § 232.2(6)(n).

(4) If, "as a direct and foreseeable consequence of the acts or omissions of" the mother, the presence of an "illegal drug" is detected in either child's body. *Id.* § 232.2(6)(o).

(5) Or, if a "parent, guardian, custodian, or other adult member of the household in which a child[ren] reside[] . . . unlawfully uses, possesses, manufactures, cultivates, or distributes a dangerous substance in the presence of a child." *Id.* § 232.2(6)(p). The list of "dangerous substance[s]" does not include tobacco. *See id.* § 232.2(6)(p)(2).

Having weighed the evidence carefully, we find the children are not clearly and convincingly in danger of being exposed to any further adjudicatory harm as defined in section 232.2(6). Illegal drugs have not been a feature in this case since the initial removal in 2017, so the definitions under subparagraphs (o) and (p) do not apply. Tobacco, which Jessica left out on two occasions, is not a dangerous substance as defined under subparagraph (p).

The State contends the mother's mental-health diagnoses impair her mental capacity to the extent that she has been unable to provide adequate care for the children, an adjudicatory harm under subparagraph (n). But we find the evidence does not support this conclusion—to the extent they affect her judgment on how to feed the children, we find the risk was minimal. Usually, the mother provided adequate food for the children, even if it was not the healthiest choice. She adjusted to their dietary needs as required. As far as supervising the children, this became a more manageable task when visitation was taking place in the mother's own home. DHS reduced the level of supervision to just hourly check-ins and noted no significant safety issues. The few specific safety issues were

addressed immediately, and the mother has expressed an understanding that she must put away dangerous or inappropriate items. The mother was able to secure housing and provide a separate bedroom for the children with their own beds. A DHS worker testified the room was clean and appropriate for the children. The mother needed reminders to change the younger child's diapers but also demonstrated an ability to remember herself. We found other "concerns" were overblown and overestimated the danger to the children. To the extent questions remain about her judgment in living with Jessica, the mother addressed this by acknowledging Jessica is not helping her and by planning to find her own place when their lease expires. We find insufficient reason to believe the mother's mental condition would result in the children not receiving adequate care in her custody.

For the same reasons, we find insufficient reason to think the mother would fail to exercise a minimal degree of care in providing adequate food, clothing, and shelter—she has demonstrated she is able to provide those essentials as required under subparagraph (g).

Finally, we do not find sufficient evidence to conclude the children would suffer harmful effects as a result of the mother's failure to exercise a reasonable degree of care in supervising them, pursuant to subparagraph (c)(2). Those reasons are explained above. But we add here that the mother has maintained her employment for over a year. She had independently secured a home and appropriate beds for the children, as well as toys and other essentials. She has provided food and gifts. She independently arranged for mental-health services for herself and for I.N., both of whom are benefiting from them. She has maintained

regular therapy and medication management appointments. She has almost always attended the children's medical and school appointments. She has had no attendance issues with visitation. All the witnesses described her as loving and affectionate with the children and described them as bonded together, despite the children being out of her care for over a year. Against this backdrop, we retain a "substantial doubt" that the children cannot be returned to her care at the present time.[3] *M.S.*, 889 N.W.2d at 679. Therefore, we reverse the termination of the mother's parental rights and remand for further proceedings. We need not address her other contentions.

**REVERSED AND REMANDED.**

---

[3] Substantial evidence was presented about how well the children are doing in their foster family. Integration into the foster home and whether the foster family are able and willing to be a permanent placement are valid factors when determining that termination of parental rights is in the children's best interests. *See* Iowa Code § 232.116(2)(b). But whether the foster parents are "better parents" is not relevant to whether the State proved the statutory grounds for termination. *See, e.g.*, *In re D.S.*, No. 17-2082, 2018 WL 2084909, at *4 (Iowa Ct. App. May 2, 2018); *In re R.S.*, No. 08-0142, 2008 WL 942500, at *6 (Iowa Ct. App. Apr. 9, 2008).