# IN THE COURT OF APPEALS OF IOWA

No. 21-1098
Filed August 17, 2022

**IN THE INTEREST OF L.E., E.E., and S.B.,**
**Minor Children,**

**S.E., Father,**
        Appellant,

**M.E., Mother,**
        Appellant,
_____

Appeal from the Iowa District Court for Polk County, Kimberly Ayotte, District Associate Judge.

A mother and father separately appeal the termination of their parental rights.  **AFFIRMED ON BOTH APPEALS.**

Jonathan M. Causey of Causey & Ye Law P.L.L.C., Des Moines, for appellant father.

Nancy L. Pietz, Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Nicole Garbis Nolan of The Youth Law Center, Des Moines, attorney for minor children, E.E. and S.B., and guardian ad litem for minor children.

Magdalena Reece of The Juvenile Public Defender, Des Moines, attorney for minor child, L.E.

Considered by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**BADDING, Judge.**

Morgan is the mother of three high-needs children—L.E., born in July 2009; E.E., born in February 2012; and S.B., born in June 2014. Shane is the father of L.E. and E.E., although he has raised S.B. as his own child. The family has a long history with the Iowa Department of Human Services, dating back to when L.E. was just one year old. Their most recent case started in June 2018 because of Morgan's alcoholism. After more than two years of services, the juvenile court decided it was time for the children to get off the "endless merry-go-round" of removal and reunification with their parents. The court directed the State to file a termination petition, which it then granted after a hearing that spanned eight days over three months. Both parents appeal,[1] challenging each step in the termination framework and raising some ancillary issues.

*I.* *Background Facts and Proceedings*

This family's story starts in 2009 with the birth of L.E., who has a micro chromosome deletion syndrome that causes "cognitive and behavioral development issues, including autism spectrum disorder." When L.E. was just eight months old, the department investigated a report related to Morgan's alcohol use. Since then, the family has been the subject of twenty-two family assessments and child abuse reports plus three child-in-need-of-assistance proceedings.

The first founded report against Morgan was in December 2011, when she was caring for then two-year-old L.E. while intoxicated. A child-in-need-of-

---

[1] S.B.'s biological father, whose parental rights were also terminated, is not involved in this appeal. And although the oldest child at first filed an appeal through his attorney, that appeal was withdrawn.

assistance petition was filed, resulting in L.E.'s removal from Morgan's care. Although Shane was "very involved" with L.E. at the time, he was living with his parents and did not believe he could care for L.E. on a full-time basis. So L.E. was placed with his maternal grandmother.

E.E. was born while the first child-in-need-of-assistance case was pending. He remained in Morgan's care after his birth at her residential treatment facility. Once Morgan successfully completed treatment, L.E. was returned to her care, and the juvenile court proceedings ended in April 2013. Morgan started drinking again within months of that case closing. And she kept drinking while pregnant with S.B., who was born positive for alcohol and diagnosed with fetal alcohol spectrum disorder.

This led to the family's second child-in-need-of-assistance case. The children were removed from Morgan's care in August 2014. The older two were placed with their maternal grandmother, and the infant was placed with a paternal relative. Even though Shane was still involved with the children, he felt it was best for them to be with their grandmother. During the second case, Morgan was again able to achieve sobriety. The children were returned to her care, and the case was closed in July 2015.

The family's success was short-lived. By January 2016, a report was made about Shane's rough treatment of E.E. as witnessed by a service provider. It was not confirmed because E.E. did not have any physical injuries. Later that year, Shane was charged with domestic abuse assault against Morgan. Child abuse reports continued to be made to the department for the next two years, mostly related to claims that Shane was throwing things at L.E. However, none of these

reports were confirmed because, with L.E.'s diagnoses, it was hard to tell what was true and what was not. During this time, Morgan started drinking again. And L.E.'s behavior became increasingly aggressive and violent. He was hospitalized multiple times in 2017 and 2018 "due to physical aggression towards himself and others."

Things became even more chaotic for the family in 2018, a year marked by multiple investigations by the department and visits from the police for help with L.E.'s behavior. In May 2018, Shane was again arrested for domestic abuse assault after throwing plates at a wall during an argument with Morgan while the children were present. A no-contact order was entered, and Shane moved into his parents' home. Later that month, Shane dropped the older two children off at Morgan's home. He left before ensuring they were able to get inside. Morgan was asleep and the door was locked, so L.E. had to go to a neighbor's house to ask for help. The department investigated the incident and issued a founded report against both Morgan and Shane for failure to provide proper supervision.

In June, L.E. again went to a neighbor's house for help because "his mother was sleeping and wouldn't wake up." L.E. was dehydrated and lethargic. When the neighbor brought L.E. home, they found Morgan lying on the bed, incoherent. The two younger children were sleeping and difficult to wake. Police transported Morgan and the children to the hospital. Once there, hospital staff found bottles of vodka in Morgan's purse. Morgan was criminally charged with child endangerment, a founded child abuse report was issued against her, and the children were once again removed from her care. Because Shane had told a child protective worker the month before that "he couldn't handle being a full time [d]ad,"

the children were placed into shelter care. The parents stipulated to the children's adjudication under Iowa Code section 232.2(6)(c)(2) and (n) (2018). L.E. remained in shelter care for several months but, in July, the two younger children were placed with Shane.

In the months that followed, Morgan began outpatient substance-abuse treatment and continued in individual therapy. Shane received help for the children in his care who, like their older brother, had significant mental-health diagnoses. These diagnoses meant the children were involved in an array of services, including medication management, individual counseling, speech therapy, and occupational therapy to name a few. Shane was able to get the children to their appointments, but he often reported feeling "exhausted and overwhelmed."

By 2019, L.E. had transitioned from shelter care, where he experienced a significant regression in behaviors, into a psychiatric medical institution for children. L.E. did well there and participated in family therapy and home visits with Shane. Morgan, however, was not doing well. She attempted suicide in March 2019 and stopped attending substance-abuse treatment. As a result, the department recommended that Morgan's parental rights to S.B. be terminated in a June report to the court. The department further recommended that custody of E.E. be transferred to Shane, who also wanted to retain S.B. in his care, and a six-month extension be granted as to L.E. In its ensuing permanency order, the juvenile court found that, while concerns remained "about the level of progress that has been made so far towards the goal of reunification," a six-month extension was "appropriate given [L.E.'s] placement . . . , the father's intention to remain married to the mother, and the mother's reported recent engagement in treatment."

Morgan did well once she got back into substance-abuse treatment. By the time L.E. was ready to be discharged from his psychiatric placement, Morgan felt ready to care for him. Shane did not, reporting that he did "not believe he can meet [L.E.'s] needs and keep the other children safe with [L.E.] in the home." In a motion to modify L.E.'s placement, the State informed the court that when Morgan "is sober, all parties agree that she does a wonderful job parenting this very high needs child." L.E. was accordingly released to his mother's care in October, while the other children continued in Shane's care.

Unfortunately, Morgan relapsed within months. In January 2020, the department received a report that Morgan "was at the children's school and smelled like mouthwash." When the family's caseworker arrived at Morgan's apartment, she was intoxicated and caring for L.E. Shane was contacted to see if he would take L.E., but he asked that L.E. go to the maternal grandmother's house instead. A couple of weeks later, E.E. showed up to school with a missing tooth. He told a child protective worker that "it was loose but his dad knocked it out when he was mad at him by hitting him in the face."

E.E.'s report was investigated by the department and not confirmed. When asked about the tooth, Shane said it happened when he was wrestling with S.B. on the floor. E.E. "was on his back. He reported he went to twist him off onto the floor. He described that [E.E.'s] tooth hit his elbow and his tooth came out." Shane's mother was present when this happened and reported the same version of events to the child protective worker. The worker observed that E.E. did not have "any like mouth trauma or anything. It looked typical of a tooth falling out."

The two younger children remained in Shane's care after this report was completed until a visit from the family's caseworker in March. During that visit, both E.E. and S.B. told the family's caseworker that "Shane was angry and hit [E.E.] in the face open handedly and accidentally elbowed him in the mouth knocking his tooth out." The caseworker also observed a broken easel in E.E.'s bedroom. When asked what happened, the children said Shane threw a "statue of a baby white tiger" when he was angry. They also said that he "put a hole in the wall" in S.B.'s room.

With these new disclosures, a hearing to modify the children's placement started in mid-March. While that hearing was pending, E.E. and S.B. were removed from Shane's care and placed with their paternal uncle and his wife. L.E. stayed with his maternal grandmother. Morgan entered residential treatment where she planned to remain for one year. At the end of the modification hearing, the juvenile court found "[t]hese children have been systematically exposed to abuse and threats of violence while in the care of Shane." The court continued:

> All the children have struggled with anger issues. This is consistent with being exposed to domestic violence/anger management issues within the home. Shane has struggle[d] to consistently provide for their mental health, physical health, and occupational therapy needs. The children have been told not to tell what is happening within the home. This places [them] at further risk of ongoing physical and emotional abuse.

The court ordered Shane to "address anger management, take accountability for the effect of his actions on the children, and participate in their services as recommended by their providers."

This order marked a turning point of sorts for Morgan and Shane. Morgan made great strides in her recovery while in residential treatment. She also began

to seriously address her mental-health issues. Shane did as well by participating in individual counseling and taking classes geared toward anger management. The parents consistently attended supervised visits with the children, stayed in contact with their service providers, went to their medical appointments, and participated in their schooling.

In a July 14, 2020 report to the court, ahead of a permanency hearing the next week, the department noted that Morgan was preparing to successfully discharge from residential treatment. While Morgan said she was okay with E.E. and S.B. being placed with her at treatment before her discharge, she told the department her facility "would not be able to house" L.E. because of his behaviors. So Morgan asked for the children to be placed with Shane. She planned to move in with him after her release. The department seemed to go along with this plan, recommending in this report that the parents' visits with the children increase and move to semi-supervised. A trial home visit with Shane was also contemplated.

But after the report was filed, the permanency hearing was continued because one of the attorneys had a family emergency. By the time the hearing was held, the department had abandoned the plan that was outlined in its prior report. Rather than having the parents' visits progress forward, the department reduced the in-person visits to ninety minutes per week and recommended termination of parental rights.

A contested hearing began in August and continued for eleven days spread out over six months. In the midst of the protracted proceedings, the juvenile court entered an order stating that "[v]istation is at [the department's] discretion with input from the children's therapists." The parents then filed motions for reasonable

efforts, requesting increased visits with the children. Shane also asked to intervene in S.B.'s case. Ultimately, the court entered a permanency order in January 2021 denying the motions for reasonable efforts and Shane's motion to intervene. On the question of permanency, the court found:

> These children have been on an endless merry-go-round for years as they have waited for their mother to demonstrate long-term, meaningful sobriety. They have waited for Shane to demonstrate the ability to meet their needs. They have waited for a home free from violence or threats of harm. The children are in need of permanency.

The court accordingly directed the State to file petitions to terminate the parents' rights.[2]

The State did so, and a termination hearing began in April. Like the prior hearing, the termination proceedings were contentious and took several months to complete. Both parents renewed their motions for reasonable efforts, again seeking more visits with the children. Shane once more sought to intervene in S.B.'s case. And Morgan revealed she was pregnant with her fourth child.

In the end, the juvenile court entered an order in July 2021 terminating Morgan's parental rights to all three children under Iowa Code section 232.116(1)(f) and (i) (2021) and Shane's parental rights to L.E. and E.E. under the same grounds. The court denied the parents' motions for reasonable efforts and Shane's motion to intervene in S.B.'s case. Morgan and Shane appeal.[3]

---

[2] The parents filed interlocutory appeals of this order, which were denied by our supreme court.

[3] Despite the parents' timely appeals, it took about a year for the case to be submitted to this court. The transcripts ordered by the parties, which included the multiple days of permanency review and termination hearings, totaled 2659 pages. On top of these voluminous transcripts are the thousands of pages of pleadings

## II.    Analysis

We apply a three-step analysis to our de novo review of termination proceedings.  *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022) (noting that in conducting our de novo review, we "give weight to the [court's] factual findings but are not bound by them").  The parents challenge each of the three steps, the first of which asks (1) whether a statutory ground for termination is satisfied.  *Id*.; *see also* Iowa Code § 232.116(1).  If so, we then consider whether (2) the children's best interests are served by termination and (3) any statutory exceptions exist and should be applied to preclude termination.  *L.B.*, 970 N.W.2d at 313; *see also* Iowa Code § 232.116(2)–(3).  If all three steps support termination, we consider the ancillary issues of whether an alternative to termination should be exercised or a parent should be granted additional time.  *See* Iowa Code § 232.117(5); *see also id.* § 232.104(2)(b), (d).

### A.    Grounds for Termination

Although Morgan and Shane challenge both of the grounds for termination the juvenile court relied on, we choose to focus on Iowa Code section 232.116(1)(f).  *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) ("On appeal, we may affirm the juvenile court's termination order on any ground that we find supported by clear and convincing evidence.").  The parents contest only the last element of this ground—whether the children could safely be returned to their home at the present time.  *See* Iowa Code § 232.116(1)(f)(4) (requiring "clear and

---

and exhibits from the child-in-need-of-assistance and termination proceedings. While the parents are entitled to their day in court, it bears repeating "that delays in the resolution of termination cases is 'decidedly antagonistic to the children's best interest[s].'" *In re C.M.*, 652 N.W.2d 204, 211 (Iowa 2002) (citation omitted).

convincing evidence that at the present time the child cannot be returned to the custody of the child's parents"); *In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018) (stating the same element in section 232.116(1)(h) is satisfied only if "the child could not be safely returned" to the parent "at the time of the termination hearing").

A challenge to the sufficiency of the evidence supporting this ground for termination implicates the reasonable-effort requirement, which is at the center of the parents' appeals and entwined with their arguments that the State did not meet its burden of proof under paragraph (f). *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent."). "When a child has been removed from a parent's care, the State has the responsibility to 'make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child.'" *In re K.P.*, No. 11-1869, 2012 WL 2122227, at *9 (Iowa Ct. App. June 13, 2012) (quoting Iowa Code § 232.102(7)).

Although the focus of reasonable efforts "is on services to improve parenting," "it also includes visitation designed to facilitate reunification while providing adequate protection for the child." *C.B.*, 611 N.W.2d at 493. The parents argue the State failed to make reasonable efforts because they were not afforded increased or less supervised visits with their children despite their compliance with all requested services after March 2020.

"Visitation, however, cannot be considered in a vacuum. It is only one element in what is often a comprehensive, interdependent approach to reunification." *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996). "[T]he nature

and extent of visitation is always controlled by the best interests of the child," which may "warrant limited visitation." *Id.* If services directed at removing the risk or danger responsible for the limited visitation have failed their objective, "increased visitation would most likely not be in the child's best interests." *Id.*

In denying the parents' request to progress with their visits, the juvenile court found:

> These children have experienced significant trauma by Shane and Morgan. . . . They have been exposed over a period of years to substance abuse, domestic violence, physical and emotional abuse, and neglect. They have been prohibited by their parents from sharing information with mandatory reporters. Shane and Morgan deny that intentional abuse has happened. That position affects the children's feelings of safety and security with their parents. The children have disrupted attachments with one or both of their parents. It is accountability work, not visitation that will repair the children's sense of safety.

Shane and Morgan stress that they took accountability for their actions, pointing to their work in individual therapy, couples' counseling, family therapy, Shane's anger management and parenting classes, and their accountability letters to E.E. But that work was not successful. After E.E.'s accountability session with Shane, E.E. shut down and told his therapist to "[c]ancel Mom's letter." He was fearful of Shane, reporting that he only felt safe at visits because they were supervised. As a result, the therapist recommended that the visits remain supervised in a neutral location. And while both Shane and Morgan acknowledged their actions harmed the children, they refused to admit that Shane did so intentionally. The most Shane would acknowledge was that he "intentionally harmed [his] children by . . . lack of proper care of both [himself] and [the] kids."

The parents argue that this case is like *K.P.*, 2012 WL 2122227, at *11, where we found the juvenile court erred in denying the mother's motion for reasonable efforts to increase visitation and attempt reunification. The mother in that case, like Shane and Morgan, "participated in numerous services and made improvements in her life." *K.P.*, 2012 WL 2122227, at *10. We found that she did "everything that every service provider and the juvenile court ha[d] asked of her," as Shane and Morgan have since March 2020, "except give a different explanation for the injury than that found by the juvenile court." *Id.* And "[e]very supervised visitation has gone well, and she parented appropriately on all those occasions"— the same as Shane and Morgan. *Id.* We concluded the fact that the mother's progress was "at a 'standstill' is not a result of the mother failing in her treatment or being unreceptive to services, but on [the department's] requirement she admit guilt before receiving additional services." *Id.*; *accord In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002).

But a "parent's failure to address his or her role in the abuse may hurt the parents' chances of regaining custody and care of their children." *C.H.*, 652 N.W.2d at 150. That is what happened here—the parents' minimization of the children's abuse prevented them from moving forward, as did their long history of involvement with the department in the decade leading up to the termination proceedings. That history was not present in *K.P.*, 2012 WL 2122227, at *1, which involved an isolated incident of abuse. *See In re T.S.*, 868 N.W.2d 425, 444–45 (Iowa Ct. App. 2015) (noting termination cases are "intensely fact-based" and "whether to reverse or not is often based on a single, or seemingly minor fact or factor").

Had this case started in March 2020, we would have much less trouble concluding that the parents' requests for more visitation should have been granted. But by the time the parents started engaging in services, the case had been open for more than a year and seen an extension of time, a return of the children, and then their removal after Morgan's relapse and Shane's inability to control his anger. A social work supervisor assigned to the case in its late stages recognized the parents' progress and commended them for it, as do we. But once she dug into the case, the supervisor concluded:

> While Morgan and Shane could be considered minimally adequate for a neurotypical child at this time, they have three special needs children. The Department needs to consider whether Morgan and Shane are minimally adequate for these children. The parents are currently doing well in their engagement in services, [but] history has shown that Morgan cannot maintain long-term sobriety and Shane struggles with coping appropriately with his anger as well as adapting his parenting strategies to the child's needs. The stress of parenting three children with special needs and an infant in one household while in a relationship with a history of domestic violence increases the likelihood of Morgan relapsing and increases the risk of abuse and neglect of the children.

We agree. The efforts these parents have made since the children were last removed from their care cannot be overlooked. But given what came before, there was still so much work to do before the children could safely be returned. *See In re L.M.*, No. 19-0165, 2019 WL 1486618, at *4 (Iowa Ct. App. Apr. 3, 2019) ("A parent's past performance is a reliable indicator of what the children can expect going forward."). We accordingly find clear and convincing evidence that the State made reasonable efforts to reunify the children with these parents but, despite those efforts, grounds for termination exist under section 232.116(1)(f).

**B.     Best Interests**

Shane and Morgan next argue that termination was not in their children's best interests. In examining this question, we give primary consideration to the children's safety; the best placement for furthering their long-term nurturing and growth; and their physical, mental, and emotional condition and needs. *See* Iowa Code § 232.116(2); *see also In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

All of the many professionals involved here testified that these children were in desperate need of stability. The years-long cycle of removal, return, and removal have harmed each one of them. *See L.M.*, 2019 WL 1486618, at *4 (finding termination was in the children's best interests where they faced a similar "experience of removal followed by return followed by removal"). The longer the case wore on, the more the children's behaviors worsened, which their therapists attributed to the lack of permanency in their lives. As the social worker supervisor questioned, "when do we say enough is enough" for these children? They need and deserve permanency now. *See C.B.*, 611 N.W.2d at 494 (stating that once grounds for termination have been established, the "proceedings must be viewed with a sense of urgency"). On our review of the record, we find the children's best interests are served by termination of both parents' rights.

**C.     Permissive Exceptions**

Both Shane and Morgan claim termination would be detrimental to the children because of the closeness of the parent-child relationships. *See* Iowa Code § 232.116(3)(c). They also assert termination is unnecessary because "[a] relative has legal custody of the child[ren]," and L.E. "is over ten years of age and objects to the termination." *Id.* § 232.116(3)(a), (b).

We begin by noting that the factors in section 232.116(3) "are permissive, not mandatory." *In re A.R.*, 932 N.W.2d 588, 591 (Iowa Ct. App. 2019). With that in mind, we find it is clear from the record that all three children are bonded to the parents at some level. But, as one therapist explained, a bond is different from an attachment: "So a bond is . . . maybe that there's the ability to have loving feelings and affection. Attachment is more with a felt sense of safety, security, and trust." All the children's attachments to their parents were ruptured, some more than others. Morgan was still working on her attachment to S.B. in family therapy. And neither parent had started attachment work with E.E., who was resistant to therapy sessions with them. While there was evidence that terminating Morgan's parental rights to L.E. would be detrimental, we cannot say that it was enough to override his need for a safe and permanent home. Given the back-and-forth all of these children have already experienced in their young lives, we decline to exercise any of these permissive exceptions. *See A.S.*, 906 N.W.2d at 475 ("We may use our discretion 'based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship.'" (citation omitted)).

Morgan relatedly claims the juvenile court should have placed L.E. in the guardianship of his maternal grandmother, which was the State's recommendation at the beginning of the termination proceedings. But that recommendation largely flowed from the fact that the department had been unable to find a foster home willing to care for L.E. and his special needs, including the paternal uncle's home where the younger two children were placed. That changed by the end of the proceedings.

The paternal uncle and aunt began visiting L.E. at his shelter placement in March 2021 when he was removed from his grandmother's care for a short time after she hurt her hand. The visits went well, prompting the relatives to inform the department in June that they were willing to be a concurrent home for L.E. The State accordingly changed its recommendation to termination. We agree that was a better permanency option for L.E., despite the close and loving relationship he shared with his grandmother. At the time of the termination hearing, she was seventy-two years old and dependent on a walker. While she was able to deal with L.E.'s behaviors, there was some concern from L.E.'s medical providers about her long-term ability to care for him. We have also considered that "a guardianship is not a legally preferable alternative to termination." *Id.* at 477 (citation omitted). For these reasons, we agree with the juvenile court's decision to not place L.E. in his maternal grandmother's guardianship.

### D. Additional Time

Morgan finally argues that the "[e]vidence presented to the [c]ourt supported a finding that i[t] was reasonably likely that the children could be returned to the custody of their parents within the next six months." *See* Iowa Code §§ 232.117(5), .104(2)(b) (allowing the juvenile court to grant additional time if parental rights are not terminated after the termination hearing). But the parents were already granted an extension of time in these lengthy proceedings. Given how long these children have already been out of their home, we must view the case with a sense of urgency. *In re A.A.G.*, 708 N.W.2d 85, 93 (Iowa Ct. App. 2005); *see C.B.*, 611 N.W.2d at 495. Considering the history of this case, we

cannot say the need for removal would no longer exist at the end of the extension. *See* Iowa Code § 232.104(2)(b). So we deny Morgan's request for more time.[4]

### E.    Motion to Intervene

This leaves us with Shane's motion to intervene in the termination proceeding for S.B.,[5] the denial of which we review for the correction of errors at law. *See In re A.G.*, 558 N.W.2d 400, 403 (Iowa 1997). While the juvenile court refused to grant Shane's motion to intervene in S.B.'s case, this ruling did not result in any prejudice to him. S.B.'s termination proceeding was tried at the same time as the proceedings for the other children. Shane was allowed to present evidence and argument in opposition to termination for all three children. Thus, if any error occurred in the court's denial of intervention, it was not prejudicial to Shane "and serves as no basis for reversal of the juvenile court ruling." *In re V.S.S.*, No. 04-1463, 2004 WL 2805535, at *2 (Iowa Ct. App. Dec. 8, 2004).

## III.    Conclusion

We find clear and convincing evidence that the State made reasonable efforts to reunify the children with these parents but, despite those efforts, grounds for termination exist under section 232.116(1)(f). We further find that termination is in the children's best interests and that no permissive exception should be

---

[4] We also find the miscellaneous claims Morgan makes without citation to the record or supporting authority have been waived, specifically her objection to "impermissible questioning by the guardian ad litem in the proceedings spanning from August 2020 until June 2021" and the juvenile court's refusal to allow an unspecified offer of proof. *See* Iowa R. App. P. 6.903(2)(g)(3); *L.N.S. v. S.W.S.*, 854 N.W.2d 699, 703 (Iowa Ct. App. 2013) ("Where a party has failed to present any substantive analysis or argument on an issue, the issue has been waived.").

[5] Although Shane also mentions his motion to intervene in the permanency proceeding, his argument is limited to the motion in the termination proceeding.

applied to preclude that result.  We agree with the juvenile court's rejection of a guardianship for the oldest child and its denial of Morgan's request for additional time.  Finally, we conclude that if any error occurred in the court's denial of intervention, it was not prejudicial to Shane.  The court's ruling is affirmed as to both parents.

**AFFIRMED ON BOTH APPEALS.**