## IN THE COURT OF APPEALS OF IOWA

No. 22-2094
Filed March 8, 2023

**IN THE INTEREST OF A.M.,**
**Minor Child,**

**H.L., Mother,**
　　Appellant.
_____

　　Appeal from the Iowa District Court for Black Hawk County, Daniel L. Block, Associate Juvenile Judge.

　　The mother appeals the termination of her parental rights to one of her children. **AFFIRMED.**

　　Mark A. Milder, Denver, for appellant mother.

　　Brenna Bird, Attorney General, and William E. Sales III, Assistant Attorney General, for appellee State.

　　Andrew C. Abbott of Abbott Law Office PC, Waterloo, attorney and guardian ad litem for minor child.

　　Considered by Badding, P.J., Buller, J., and Potterfield, S.J.*

　　*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**POTTERFIELD, Senior Judge.**

The juvenile court terminated the mother's parental rights to one of her children, A.M., who was not yet one year old at the time of the termination trial.[1] The court ordered termination under Iowa Code section 232.116(1)(e), (g), and (h) (2022).[2] On appeal, the mother challenges the statutory grounds for termination,argues the loss of her rights is not in A.M.'s best interests, and claims a permissive factor should be applied to save the parent-child relationship. She also asks for additional time to work toward reunification.

**I. Background Facts and Proceedings.**

The mother gave birth to one child in 2017 and another in 2020. The Iowa Department of Health and Human Services became involved with the family in 2020; the mother initially engaged in services on a voluntary basis.

But then, in December 2020, the children were removed from the mother's custody following the mother's acts of violence against the maternal grandmother, with whom the mother and children lived. The mother admitted to times when "everything goes red" and she acts in uncontrolled rage; she also reported past diagnoses of anxiety and depression. In addition to the mother's mental-health issues, there were also concerns the mother did know how to meet the children's needs. Following the birth of the child born in 2020, medical professionals reported

---

[1] The parental rights of the presumed biological father were also terminated; he does not appeal.

[2] Termination of parental rights pursuant to section 232.116(1)(g) requires that "[t]he court has terminated parental rights pursuant to section 232.117 with respect to another child who is a member of the same family." Iowa Code § 232.116(1)(g)(2). In May 2022, the mother lost her parental rights to the children born in 2017 and 2020. A panel of this court affirmed those terminations in *In re A.S.*, No. 22-0894, 2022 WL 2826051 (Iowa Ct. App. July 20, 2022).

the mother was unable to follow basic instructions regarding how to appropriately hold and feed the child. The mother participated in services meant to address her parenting skills, but questions about her ability to care for the children persisted.

Then, in the fall of 2021, the mother completed a family-centered psychological evaluation with a licensed psychologist. The psychologist authored a report, in which he diagnosed the mother with a mild intellectual disability. He concluded the mother's intellectual skills are "substantially below average making it very difficult for her to understand or learn appropriate parenting behaviors that can assure the safety of her children" and found her to have "a number of serious perceptual, thinking, motivational and social problems with which . . . , contribute significantly to her parental inadequacies." According to the psychologist, "it [was] highly unlikely that either of these sets of difficulties can be remediated," so "it [did] not appear to be feasible to allow [the mother] to have unsupervised contact or custody of her children."

A.M.—the child at issue here—was born in February 2022; he was removed from the mother's custody before being discharged from the hospital. The older children remained outside of the mother's care, and A.M. was placed with his siblings in foster care.[3]

A.M. was hospitalized multiple times in the months following his birth for feeding and breathing issues. Doctors discovered he had a diminished lung and two holes in his heart. He underwent surgery to correct an issue with his airway, which did not resolve his eating and breathing issues.

---

[3] The oldest child was physically aggressive toward the youngest two and was eventually removed to a separate foster family.

The maternal grandmother died in April 2022, leaving the mother living alone in the grandmother's home. The family decided it would sell the grandmother's home and vehicle, which would leave the mother without a home or transportation once the sales were finalized. The mother's extended family and the department helped the mother get involved with adult-centered services and apply for social security disability benefits; for a while, the mother considered moving into a group placement.

The juvenile court terminated the mother's rights to the two older children in May.

In August, A.M.'s doctors determined his breathing issues were related to aspirating on liquids. A.M. was given a feeding tube, which allowed him to engage in more "normal" activities, such as going to daycare with other children.

Then in September, A.M. moved to a second foster family. This family had care of A.M.'s siblings and hoped to adopt them.

The termination trial took place in November. At that time, the mother was recently approved for social security disability and expected to receive $1200 per month going forward plus a $30,000 lump sum for back payments she was owed. She continued to live in a hotel room—as she had for the two months since the grandmother's home sold—but signed a lease for an apartment starting December 1. The social worker testified about A.M.'s ongoing medical needs due to his issue with aspirating; because of his feeding tube, A.M. was receiving occupational therapy to learn to eat off the bottle. He was also receiving physical therapy for his weakened neck. A.M. was scheduled for a second surgery in December, and his doctors hoped that would resolve his problems with swallowing

and aspirating. The social worker noted the mother still required prompting to feed and change A.M. during supervised visits. The worker also highlighted the mother's failure to follow through with getting the older children to their necessary medical appointments when they were in her care (including speech therapy and physical therapy, which the oldest needed), even though the mother had help from the maternal grandmother then. Additionally, the social worker shared that when participating in one of A.M.'s recent medical appointments, the mother could not accurately recall his medical history—she reported A.M. had never been put under anesthesia before. The mother also struggled to keep track of and attend her own appointments, in spite of the additional reminders she received.

The juvenile court filed its written order terminating the mother's parental rights to A.M. in December, finding:

> [The mother] has been receiving services through the [department] since September, 2020. . . . Diligent efforts have been made by professionals to assist [the mother] in addressing her deficient parenting abilities. These efforts include providing written materials, hands-on education, modeling, multiple parent education programs and parent skill developmental services. Despite the offer and receipt of the services for over two years, [the mother] has made no progress in addressing the issues which led to her children's removal. [She] has not moved [past] supervised visitations. [She] is unable to apply parenting techniques from one visitation to the next. Following the birth of [the middle child and A.M.], [the mother] has been unable to remember when or how to adequately feed the children. She reported not knowing what to do when they cried and often defers to the person who is supervising visitations. [The mother] has been unable to follow basic nursing staff instructions. These same concerns continued to exist following the birth of [A.M.], after over two years of professional interventions.
>     . . . [The mother] has been referred to County Social Services for additional adult services and support. [She] initially refused to follow through with these resources, however, recently has engaged with adult services. [She] has recently been approved for Social Security benefits[; she] will be required to have a payee. [she] has requested that [the presumed father] be the payee. [She] has also

placed [him] on the lease for her new residence. [The presumed father] has never demonstrated a commitment to the relationship with [the mother] or her children. He has not made himself available for services or for his children in any capacity. Without the Social Security assistance, [the mother] will be homeless. She is currently living in a hotel that is being paid by an aunt.

[A.M.] has been removed from the care of [the parents] since birth. The concerns which led to the child's removal continue to exist today. The inability of [the mother] to consistently demonstrate basic parenting skills remains a chronic issue. Supervision concerns continue to exist even during supervised visitations.

The mother appeals.

## II. Standard of Review.

We review termination of parental rights de novo. *In re T.S.*, 868 N.W.2d 425, 431 (Iowa 2015).

## III. Discussion.

First, we consider whether the State proved a ground for termination. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). Where, as here, the court ordered termination under multiple grounds, we can affirm on any ground we find supported by the record. *T.S.*, 868 N.W.2d at 431. We choose to consider termination under section 232.116(1)(h), which allows the court to terminate when:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

The mother only challenges the fourth element—whether A.M. could be returned to her custody at the time of the November 15, 2022 termination trial. *See In re*

*D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting "at the present time" in section 232.116(1)(h)(4) as "at the time of the termination hearing"). Assuming the mother has done enough to warrant us reaching the merits of this issue,[4] *see In re N.H.*, No. 21-1540, 2022 WL 108573, at *3 (Iowa Ct. App. Jan. 12, 2022) (electing to reach the merits in spite of questions about error preservation), we agree with the district court that the mother was not able to parent A.M. on the date of the termination trial.

The mother is unable to parent A.M on her own. While she loves him and wanted to learn the necessary parenting skills, she has been unable to do so. She may have shown some improvement at repetitive tasks like feeding and changing the child, but the mother is unable to deal with the unexpected or the new—she needs someone to guide her in those moments. Because her cognitive disability affects her capacity to provide care and, accordingly, affects A.M.'s well-being, it is a relevant consideration in deciding whether to terminate. *See In re A.M*, 843

---

[4] At trial, the mother presented less than a full-throated defense against termination under paragraph (h). During closing arguments, the mother's attorney admitted the mother did not have a home and "need[ed] more time to establish either employment or income." The attorney also recognized contesting termination under paragraph (h) was "a hard argument for [the mother] to make given where [she's] at today." And here on appeal, the mother continues to equivocate, stating:

> [Termination under paragraph (h)] comes down to whether or not the mother can adequately and safely parent this child at this time. The only testimony at trial was the DHS caseworker who had been only recently assigned to the case. The Department testified that the child could not return, but acknowledged some advancement and improvement. Would additional time have made a difference? One cannot say for certain, but the chance should have been given. Again, no safety concerns had occurred in nine months of supervised visits. That alone was a reasonable argument that the child would indeed be safe if returned now. At a minimum, allowing a move to less supervision to test it out was warranted and would have been safe with the support of the Department and the mother's family.

N.W.2d 100, 111 (Iowa 2014); *see also In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010) (emphasizing the father's "poor decision making makes him unable to provide a safe and nurturing home for his child"). Like *In re A.S.*, the mother "willingly participated in the services offered and has progressed, but she has not progressed to the point where she can care for the child without ongoing assistance." 906 N.W.2d 467, 473 (Iowa 2018). Under these circumstances, A.M. could not be returned to his mother's care; the State proved the ground for termination under section 232.116(1)(h). *See id.* at 474–75.

Next, the mother argues that even if she could not take over caring for A.M. at the time of the termination trial, she would have been able to after a short extension. *See* Iowa Code § 232.104(2)(b) (allowing the court to continue placement of a child for six months if the court determines "the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period"). We recognize that many of the external concerns were expected to be resolved soon after the trial date—the mother was approved for monthly social security payments, planned to move into a new home, and was hoping to find reliable transportation. These are big steps. But they are not enough to make A.M. safe in the mother's care. And, based on her lack of progress nearly two years into court-involved services and the psychologist's report indicating it was unlikely the mother's "difficulties can be remediated," we cannot say any extra time will fix the issues.

The mother argues termination of her rights is not in A.M.'s best interests. *See* Iowa Code § 232.116(2). In making a best-interests determination, we "give primary consideration to the child's safety, to the best placement for furthering the

long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." *Id.* A.M. was never in the mother's care; he was discharged from the hospital at birth into foster care. His current foster placement is with his two older siblings, and the foster family has indicated their hope to adopt all three siblings. *See id.* § 232.116(2)(b) (allowing the court to consider "whether the foster family is able and willing to permanently integrate the child into the foster family" under the best-interests framework). In contrast, the mother is not now and may never be able to provide safe, full-time care for A.M. Permanency is in A.M.'s best interests.

Finally, the mother argues the juvenile court should have relied on a permissive factor in section 232.116(3) to avoid termination. She maintains the loss of her rights will be detrimental to A.M. because of the closeness of their relationship. *See id.* § 232.116(3)(c). But the mother has not established that A.M. "will be disadvantaged by termination" and that the disadvantage from termination "overcomes [her] inability to provide for [A.M.'s] developing needs." *D.W.*, 791 N.W.2d at 709; *see also In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018) (holding "the parent resisting termination bears the burden to establish an exception to termination"). Applying the permissive factor to save the parent-child relationship is not warranted.

We affirm the termination of the mother's parental rights to A.M.

**AFFIRMED.**