# IN THE COURT OF APPEALS OF IOWA

No. 23-0450
Filed July 13, 2023

**IN THE INTEREST OF D.G.,**
**Minor Child,**

**A.L., Mother,**
 Appellant.

_____

Appeal from the Iowa District Court for Webster County, Joseph L. Tofilon,
District Associate Judge.

A mother appeals the termination of her parental rights to her three-year-
old daughter. **AFFIRMED.**

Douglas Cook of Cook Law Firm, Jewell, for appellant mother.

Brenna Bird, Attorney General, and Natalie Hedberg, Assistant Attorney
General, for appellee State.

Alesha M. Sigmeth Roberts of Sigmeth Roberts Law, PLC, Clarion, for
father.

Gregory H. Stoebe, Humboldt, attorney and guardian ad litem for minor
child.

Considered by Bower, C.J., and Tabor and Greer, JJ.

**TABOR, Judge.**

A mother appeals the termination of her parental rights to her three-year-old daughter. She contends the juvenile court erred in denying her request for a six-month extension; termination was not in the child's best interests; and the court should have applied a permissive exception for a close parent-child relationship. Despite showing promise at points in the proceedings and receiving three previous extensions, the mother's progress stalled. Like the juvenile court, we find another delay was unwarranted. And rejecting the mother's other claims, we affirm.

## I. Facts and Prior Proceedings

This case began in December 2019 when concerns arose that Annette and William[1] were using illegal drugs around their four-month-old daughter, D.G. Annette's probation officer reported to the Iowa Department of Health and Human Services that she assaulted William and appeared to be impaired. Both admitted using methamphetamine, so the department determined the child abuse allegation was founded. D.G. remained in the home until April 2020. That month, she went with Annette to a residential drug treatment program. But Annette left in June without completing the program because she was worried about the COVID risk. She continued to attend substance-abuse and mental-health services. William had not yet obtained a substance-abuse evaluation. They rented a home together, and the department had no safety concerns.

---

[1] William, who received a six-month extension rather than a termination of his parental rights, did not appeal. He did file a "joinder" to the mother's appeal. Generally, "one parent cannot assert facts or legal positions pertaining to the other parent because the juvenile court makes a separate adjudication as to each parent." *In re S.O.*, 967 N.W.2d 198, 206 (Iowa Ct. App. 2021) (emphasis omitted). William's "joinder" has no legal effect, and we don't address it further.

Then, in July, William was jailed on felony charges. That same month, Annette admitted to her substance-abuse counselor that she had been using. The department also learned that Annette left D.G. in the care of a man who had a warrant out for his arrest. Both parents signed a voluntary removal order, and D.G. was placed in foster care.

After the removal, Annette had twice a week visitation with D.G. The social worker noted Annette's home was safe and appropriate, and visits went well. Mother and daughter had "a very good relationship." In October 2020, Annette reported that she had been sober since August. She participated in outpatient substance-abuse treatment. Eventually she progressed to semi-supervised visits. In November 2020, Annette began another outpatient treatment program. Her progress was promising. But in January 2021, a drug test for her probation officer came back positive for methamphetamine. She was also discharged from her treatment program and had no place to live.[2] Yet things improved again that spring when Annette submitted negative drug tests, completed a substance-abuse evaluation, attended therapy, and was employed.

Although D.G. had been out of her care for a year, in May, the court granted Annette six more months to reunify. Sadly, things soon fell apart: Annette was arrested and sent to a residential correctional facility. She absconded and was arrested again. She missed many visits. Then, she reentered the residential facility. She regained employment, reestablished visitation, attended substance-abuse treatment, attended therapy, and was generally doing well.

---

[2] William remained in jail awaiting trial.

Given her renewed progress, in November, the court granted her a second extension. But the next month, she reported relapsing on methamphetamine. In January 2022, she relapsed again. Yet by May, her social worker reported she had "steadily made progress." She completed an inpatient substance-abuse program and entered a halfway house for long-term treatment. The social worker noted a "remarkable change" in Annette. She found housing and work, participated in treatment, and attended therapy. So the department allowed semi-supervised visitations with D.G.

And Annette received a third six-month extension. In June 2022, she had overnight visits with D.G. And the department planned to transition D.G. back to her custody. But that month, Annette relapsed and left treatment. A search of her belongings turned up methamphetamine, and her recent drug test was positive for MDMA, methamphetamine, and amphetamines. She tried inpatient treatment at the YWCA in July, but left after two days. Over the next six months, Annette had repeated relapses. Her visits with D.G. were fully supervised. In November, the social worker reported that Annette was having trouble staying sober. The department changed its recommendation from reunification to termination, and the State petitioned to terminate in December 2022.

After a January 2023 hearing, the court granted William another six months to work toward reunification. The court found William was likely to be paroled in the next two months. He obtained a welding certificate in prison, had a job lined up, and would have income after his release to promptly secure housing for himself

and D.G. On top of that, he had shown he could safely parent D.G. in visits and that the two shared a bond.[3]

At the same time, the juvenile court found clear and convincing evidence to terminate Annette's rights under Iowa Code section 232.116(1)(h) (2022). But it held another hearing to decide whether granting Annette yet another extension would be in D.G.'s best interests. After that supplemental hearing, in February 2023, the court declined to give her more time. It found termination was in D.G.'s best interests, and no permissive exception applied. Annette appeals.[4]

## A. Extension

Annette first argues the court erred in denying her more time to reunify. She claims to understand "her issues" and insists "[s]ubstance abuse was the only significant factor preventing her from regaining custody and could easily be remedied in the next few months." Courts may delay permanency for six months only if the need for removal will be resolved in that time. *See In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) (discussing section 232.104(2)(b)). Annette received three such reprieves, when the juvenile court saw her making progress. But each time the promising signs disappeared. Now, after D.G. has been

---

[3] The court acknowledged that William was the "secondary beneficiary" of all the extensions given Annette. Still, it determined D.G.'s best interests were served by giving him more time. He does not appeal, and we do not disturb that decision.

[4] We review termination decisions de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). We will uphold an order when there is clear and convincing evidence of the statutory grounds for termination. *In re T.S.*, 868 N.W.2d 425, 434 (Iowa Ct. App. 2015). We give careful consideration to the juvenile court's factual findings and in-person observations, but we are not bound by them. *See In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). Our top priority is the child's best interests. *See In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (identifying safety and the need for a permanent home as the "defining elements" in the best-interests determination).

removed from Annette's custody for more than two years, we cannot find that she could resolve the need for removal this time.

Indeed, the record shows the reasons for optimism present during the previous extensions were gone when Annette requested a fourth extension. She fell into a cycle of relapses and had used methamphetamine just days before the initial termination hearing. She was not engaged in treatment. And the home she offered D.G. was not appropriate because her roommate smoked marijuana. To merit more time, Annette would need to show more substantial progress. Considering her recent drug use, her insistence that she could "easily" remedy that issue in six months rings hollow. Despite showing promise at points, Annette's progress stalled, and D.G.'s need for permanency was urgent. *See In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000). These facts do not support an extension.

## B. Best Interests

Annette next argues termination was not in D.G.'s best interests. We determine best interests using the framework described in section 232.116(2). *See In re A.H.B.*, 791 N.W.2d 687, 690–91 (Iowa 2010). We give "primary consideration" to D.G.'s safety, to the best placement for furthering her long-term nurturing and growth, and to her physical, mental, and emotional condition and needs. Iowa Code § 232.116(2). The "defining elements" of the best-interests analysis are the child's safety and "need for a permanent home." *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011) (citation omitted).

Those "defining elements" do not favor Annette's position. Since the last extension, her situation has worsened. She admitted to relapsing more than twenty times since June 2022. She has been unable to complete a substance-

abuse treatment program. And she has not attended therapy consistently, though she had reengaged by the supplemental hearing.

Yet she points to the preservation of William's rights, contending since he received more time, she should have too. She argues, "If William fails in the next six months, additional time granted to Annette will not delay permanency." True, it is unusual to grant an extension for one parent and not the other. But in the end, each parent's rights are assessed separately. *See S.O.*, 967 N.W.2d at 206 ("[O]ne parent cannot argue for preservation of their rights based on the situation of the other parent.").

After two-and-a-half years, Annette has been unable to become a reliable parent. Most of that time, D.G. has lived with the same foster parent, who is willing to adopt her if William is not a safe option. We recognize Annette is intelligent and self-reflecting. And when sober she is, by all accounts, an attentive and loving mother. But she has been unable to control her addiction. So D.G.'s short- and long-term nurturing and growth are best served by terminating Annette's rights.

### C. Permissive Exception

Finally, Annette argues their strong bond should have precluded termination. Section 232.116(3)(c) allows the court to forgo termination when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Annette bears the burden to persuade us to apply this factor. *In re A.S.*, 906 N.W.2d 467, 475–76 (Iowa 2018). She has not done so. Granted, workers reported that visitation went smoothly; Annette and D.G. enjoyed each other's company; and Annette was an attentive parent during visitation. That said, we find

little evidence of a bond so strong that D.G. would suffer harm from termination. In fact, D.G. has said she does not want to go to visitation and has had night terrors after visits. We find Annette did not carry her burden to prove we should apply a permissive exception to termination. So we affirm.

**AFFIRMED.**