# IN THE COURT OF APPEALS OF IOWA

No. 25-0582
Filed July 2, 2025

IN THE INTEREST OF L.S.-M.,
Minor Child,

M.M., Father,
    Appellant.
_____

Appeal from the Iowa District Court for Linn County, Carrie K. Bryner, Judge.

A father appeals the juvenile court order terminating his parental rights to his minor son. **AFFIRMED.**

David R. Fiester, Cedar Rapids, for appellant father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Annette F. Martin, Cedar Rapids, attorney and guardian ad litem for minor child.

Shelby M. Smail, Cedar Rapids, attorney for minor child.

Considered without oral argument by Schumacher, P.J., and Buller and Sandy, JJ.

**SANDY, Judge.**

A father appeals the juvenile court order terminating his parental rights to his minor son, arguing the juvenile court should have applied a permissive exception to termination based on the parent-child bond. Additionally, he asserts the juvenile court should have established a guardianship for his son in lieu of terminating his parental rights.

Upon our de novo review of the record, we affirm.

## I. Background Facts and Proceedings

L.S.–M.—born in 2015—is the subject of this appeal. Due to his mother and father frequently cycling in and out of incarceration, he has primarily lived with his paternal grandmother since he was six months old. In 2018, the father was convicted of domestic abuse perpetrated against the mother and served nearly five years in prison. The mother has never had a meaningful presence in L.S.-M.'s life. Historically, she has struggled with substance use—primarily methamphetamine.

L.S.–M. first came to the attention of the Iowa Department of Health and Human Services (HHS) in December 2022 after a child-abuse assessment was opened against the father. It was alleged that the father physically abused L.S.–M. by grabbing him by the arm and throwing him to the ground. The HHS worker who investigated the allegations observed that the child had a sizable "bruise on the upper part of his back" and "on-going back pain." These observations led to a confirmed assessment for physical abuse against the father.

Shortly after the confirmed child abuse assessment against the father, L.S.–M. again came to the attention of HHS due to his behavior while in the paternal grandmother's care. L.S.–M. is a child with significant mental health issues. He

has been diagnosed with "thought disorder, attention deficit and hyperactivity disorder/unspecified type, autism spectrum disorder, anxiety disorder, and unspecified mood disorder." He also has a previous diagnosis for bipolar disorder. While in his paternal grandmother's care, L.S.–M. frequently displayed problematic behaviors—such as skipping school and acting aggressively toward people and animals. During one incident, L.S.–M. stole the keys to the paternal grandmother's car and crashed it into an air conditioning unit attached to her home. Feeling overwhelmed due to L.S.–M.'s behavior, the paternal grandmother contacted HHS for assistance.

In January 2023, the State filed a child-in-need-of-assistance (CINA) petition for L.S.–M. The child was removed from the mother's custody in February and temporarily placed in the father's custody.[1] L.S.–M. was adjudicated in need of assistance in March, and custody was ordered to remain with the father subject to HHS supervision. However, the child was moved from the father's custody a month later and subsequently placed in the custody of HHS for purposes of foster family care, relative placement, or placement with other suitable adult. Ultimately, the child was placed with the paternal grandmother.

However, in June 2024, L.S.–M. was removed from the paternal grandmother's care after it was discovered she allowed the father to temporarily move into her home. The child was then placed in foster care. But L.S.–M.'s initial placement in foster care did not last long because the foster family "contacted HHS

---

[1] While temporarily in the father's custody, L.S.–M. was placed in a psychiatric medical institute for children (PMIC). He remained at the PMIC from March 2023 to October 2023.

and explained they did not feel safe providing care to [him]." Due to his "disruptive and aggressive behavior," HHS was unable to locate another foster family for L.S.–M. He was temporarily placed in a shelter home before being approved for placement in a therapeutic foster home—where he remained until the time of the termination hearing. By all accounts, L.S.–M. thrived in the therapeutic foster home, with his behavior greatly improving.

Throughout the underlying CINA case, HHS expressed concerns over the father's mental health, his manipulation of the paternal grandmother to influence her parenting of L.S.–M., and his propensity for violence.[2] The father did not participate in any services to address these concerns.[3] He often displayed a hostile attitude toward HHS case workers assigned to the family, and he made it known numerous times that he had no intention of resuming care of L.S.–M. upon the case's closure. The father told one HHS case worker that "he cannot control [L.S.–M.] and does not want to." He also repeatedly indicated L.S.–M. was not welcome in his home because he had "other obligations to attend to." Besides obtaining a substance-use evaluation, the mother also did not participate in any services. And she only attended one visit with L.S.–M. during this case.

Due to the parents' failure to participate in services, the State filed a petition to terminate their parental rights. A termination hearing was held in December 2024, during which the juvenile court heard testimony from the father,

---

[2] As the juvenile court noted in its thorough ruling, the father "has a long criminal history with multiple assault charges."

[3] The father did obtain a mental health evaluation in October 2024—nearly eighteen months after the underlying CINA case opened, and two months prior to the termination hearing.

the paternal grandmother, and the HHS case manager assigned to the family. Following the hearing, the juvenile court issued its order terminating the mother's and father's parental rights.[4]

This appeal followed.

## II.     Standard of Review

"We review termination of parental rights de novo." *In re T.S.*, 868 N.W.2d 425, 431 (Iowa Ct. App. 2015). "We give weight to the juvenile court's factual findings, especially when considering the credibility of witnesses, but we are not bound by them." *In re H.S.*, 805 N.W.2d 737, 745 (Iowa 2011). "The paramount concern in a termination proceeding is the child's best interests." *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022).

## III.     Analysis

We use a three-step analysis in reviewing the juvenile court's termination of parental rights. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). We analyze whether (1) a statutory ground for termination has been established by clear and convincing evidence; (2) whether termination is in the child's best interest; and (3) whether any permissive exceptions should be applied to preclude termination. *In re A.B.*, 957 N.W.2d 280, 293, 299–300 (Iowa 2021).

"However, if a parent does not challenge a step in our analysis, we need not address it." *In re J.P.*, No. 19-1633, 2020 WL 110425, at *1 (Iowa Ct. App. Jan. 9, 2020). With this framework in mind, we turn to the father's arguments on appeal.

---

[4] The mother does not appeal.

**A. Permissive Exception**

The father first argues that the juvenile court should have declined to terminate his parental rights due to the closeness of the parent-child bond. But as an initial matter, we conclude the father did not preserve error on this issue. To properly preserve error for appellate review, a party must both raise the issue in the district court and obtain a ruling on that issue. *In re J.R.*, __ N.W.3d __, 2025 WL 52738, at *2 (Iowa Ct. App. 2025) (holding that when a parent fails to raise a permissive exception during the termination hearing, they cannot pursue it on appeal.). Here, the father did not raise the issue of the parent-child bond permissive exception in the juvenile court. And the juvenile court did not address the issue in its ruling. Consequently, the father's argument on this issue has not been preserved for our review.

But even if the father had preserved error on this issue, he would fare no better. Iowa Code section 232.116(3)(c) permits the juvenile court to decline terminating parental rights if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." The permissive exceptions under section 232.116(3) "are permissive, not mandatory, and the burden to prove the exception is on the parent challenging termination." *In re L.N.*, No. 22-0702, 2022 WL 3907745, at *3 (Iowa Ct. App. Aug. 31, 2022). In this case, there is little to no evidence that the father shares a meaningful bond with the child. Rather than parenting the child to establish a bond, the father elected to place the child with the paternal grandmother when he was less than a year old. The father has had only sporadic contact with the child since he made this decision. Further, as the

juvenile court noted in its ruling, the father "did not participate in any sanctioned visits with" L.S.–M. during the duration of this case. We are not convinced the evidence establishes that a meaningful bond exists between the father and the child.

### B. Guardianship

Next, the father asserts in passing that the juvenile court should have considered establishing a guardianship with the paternal grandmother. However, he does not cite any legal authority that supports his minimal argument on this issue. Accordingly, we conclude he has waived this argument. *See In re K.P.*, No. 23-1661, 2024 WL 260885, at *3 (Iowa Ct. App. Jan. 24, 2024) ("[A]s we have held before, 'sprinkled mentions of an issue' are insufficient to raise legal claims for our consideration." (citation omitted)).

However, even if the father had properly raised this issue for consideration, we would conclude that a guardianship with the paternal grandmother was not a viable alternative in this case. *See* Iowa Code § 232.104(2)(d)(2) (permitting the juvenile court to "[t]ransfer guardianship and custody of the child" in lieu of terminating parental rights). In determining whether a guardianship is a viable alternative to termination, we consider "the child's age, the length of the removal, the viability of other permanency options, and the relationship between the parent and guardian." *In re G.S.*, No. 23-0902, 2023 WL 5092545, at *2 (Iowa Ct. App. Aug. 9, 2023). However, our case law makes clear "that a guardianship is not a legally preferable alternative to termination." *In re B.T.*, 894 N.W.2d 29, 32 (Iowa Ct. App. 2017).

A guardianship in this case would not have been appropriate. There is evidence that the paternal grandmother and father have poor boundaries. There is evidence in the record that the father has repeatedly attempted to control and manipulate the paternal grandmother to influence her care of L.S.–M. Moreover, their relationship is tumultuous. At one point the paternal grandmother considered seeking a no-contact order with the father. This gives us little confidence a guardianship would have been feasible or beneficial for the child. *See In re G.S.*, 2023 WL 5092545, at *2.

## IV.  Conclusion

In sum, we affirm the juvenile court's order terminating the father's parental rights.

**AFFIRMED.**